## C. A. RUPE v. THE STATE.

### No. 2112.   Decided February 6, 1901.

**1.  Murder—Accomplice—Impeachment of—Immaterial Evidence.**

On a trial for murder, where a confessed accomplice had testified that a conversation he had had with one S. in the river bottom where he, the accomplice, was in concealment, was on the second day after the homicide, and the defendant proposed to prove by S. that the conversation was on the day next succeeding the homicide.  Held, the matter was not material and did not afford a basis for the contradiction of the accomplice, and consequently the court did not err in excluding the proposed contradictory testimony.

**2.  Murder by Administering Poison—Proof of Deceased's Reputation as Being Addicted to the Use of Morphine.**

On a trial for murder by administering morphine to deceased, it is not competent to prove, by the reputation he bore, that deceased was a morphine fiend independently of any testimony at all showing that deceased actually ate or used morphine, or that he had taken any morphine voluntarily shortly before his death.

**3.  Same.**

See opinion for facts stated, upon which the court holds, that even if the fact that deceased was a morphine fiend could be proved by reputation, the witnesses did not show themselves sufficiently conversant with deceased's reputation in that respect.

**4.  Same—Medical Expert—Hypothetical Opinion.**

If the testimony upon which a hypothetical opinion of a medical expert is to be given be itself inadmissible, then the opinion is also inadmissible, because there is nothing upon which to found it.

**5.  Same—Experiment Evidence—Bills of Exception as to.**

Where evidence as to experiments made in connection with facts pertaining to a homicide is objected to, because such experiments were not made under similar circumstances and conditions, the bill of exceptions, to be sufficient, must show what the original circumstances and conditions were, and wherein they were not similar to those at the time of the subsequent experiments.

**6.  Bill of Exceptions—Judge's Certificate to.**

The judge's certificate to a bill of exceptions is not a certificate as to the truth of the matters stated in the bill, but is only to the effect that the bill itself was so taken.

**7.  Experiment Evidence.**

The rule allowing the admission of experiment evidence does not require that the conditions must be similar, or exactly similar; they are only required to be similar or nearly so. .

**8.  Witness—Corroboration.**

A witness who is not an accomplice, and whose testimony has not been contradicted nor controverted, is not required to be corroborated.

**9.  Murder by Poison—Charge.**

On a trial for murder by administering poison, the court, in applying the law to the facts, only submitted murder in the first degree; and correctly instructed the jury that if the death of deceased was produced by morphine or chloral, or both, administered by defendant; and if such substances were poisons or constituted a noxious drink when mingled with beer, and were administered for the purpose of enabling defendant to steal from the person of deceased, defendant would be guilty of murder in the first degree, although the quantity and manner of the use of said drugs may have been an accident or mistake.

**10.  Same—Murder in the First Degree—Statutes Pertaining to.**

The article 711, Penal Code, makes all murder committed by poison murder in the first degree; and said article embraces articles 647, 648 and 649, and makes

all murder, under these latter articles, murder in the first degree. Following Tooney v. State, 5 Texas Crim. App., 163.

**11. Same—Malice Inferred.**

The intentional administration of poisons, with intent to kill or inflict serious bodily injury, is itself evidence from which malice is inferred; and a murder so committed is, under our statutes, murder in the first degree.

**12. Same—Murder in the Perpetration of Another Felony—Malicious Intent.**

When the administration of poison is with the intent to enable the party administering it to perpetrate another felony, and, if in its consummation, the party by accident or mistake gives more poison than he intended and thereby causes the death of his victim, this is murder; and, being accomplished by poison, it is made by our law murder in the first degree. Defendant's intent, as to the effect of the poison, that he did not intend it to kill, is immaterial where he is engaged in the perpetration of a felony and uses the poison as a means to enable him to accomplish his crime. Our statute makes the intent to injure by poison supply the malicious purpose to kill; and, if death ensues, it is murder, although death was not intended.

**13. Same—Requested Instruction.**

On a trial for murder by poison where it was charged and appeared that two poisons, to wit, chloral and morphine, were both administered to deceased and that defendant was present and participated in the entire transaction, the fact that defendant introduced testimony to show that he may have been present when the morphine was administered, but was absent when the chloral was administered, does not present a reason why the court should have given his requested instructions to the effect that he would only be responsible if death ensued from the administration of morphine.

Appeal from the Criminal District Court of Dallas. Tried below before Hon. Charles F. Clint.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of A. T. Randall on the 13th day of September, 1898, by administering to him poisons, to wit, morphine and chloral, and that said poisons were administered in order to enable defendant to steal money from the person of the said A. T. Randall.

The respective theories, both of the State and the appellant, will be fully seen from the following statements made in appellant's brief: "About the 1st of December, 1898, the father of appellant became the proprietor of a small beer saloon, known as the Rock Saloon, situated a few blocks south of the courthouse in the city of Dallas, and placed his son, appellant, in charge as barkeeper. On the evening of December 13th thereafter, while appellant, one Bob Coleman, and Lillian Graves, a colored prostitute, were in the saloon, the deceased, A. T. Randall, who appears to have been a peripatetic country school-teacher much given to habits of intoxication, came in about 6:15 or 6:30 p. m. and made a display of small sums of money, a few dollars-in silver and a $5 bill, about $8 or $9 in the aggregate. The theory of the State as to what thereafter took place is, substantially, that appellant Rupe requested Bob Coleman (after the display by deceased of the money) to go to the bar, which was situated in a front room adjoining and cut off by a partition from the room in which all four of said parties

then were, and draw beer; that Coleman, in accordance with appellant's direction, went to the front room to draw the beer, whereupon appellant immediately followed Coleman into the front room and behind the bar and took from the cash drawer a bottle filled with some clear liquid that looked like water, but which he stated was morphine, and proposed to Coleman to "dope" the deceased, in which proposition Coleman acquiesced; that appellant thereupon poured about half the contents of the bottle into the beer prepared for and given to deceased, who drank it. This was about 6:15 p. m.; that after a short time beer was again prepared for deceased and the balance of the contents of the bottle poured into it, and deceased drank it; that drinks were then served two or three times more without anything deleterious being mixed in them; that the witness Jim James came in at this juncture, and the woman Lillian Graves almost immediately left the saloon; that Randall then left, leaving only appellant, Coleman, and Jim James in the saloon; that then James left, and appellant stated to Coleman that he (appellant) would go out and see if he could find the "old man"—the deceased—and went out; that while appellant was out of the saloon the deceased returned, and then Charlie (appellant) returned with his uncle, S. C. Rupe, having been absent but a few minutes; that at this time appellant's brother, Dallas Rupe, came in and he (Dallas Rupe) and the uncle, S. C. Rupe, immediately left; that then the appellant directed Coleman to go to the Opera House drug store, near by, and get 10 cents worth of chloral, which he did, leaving appellant and deceased in the saloon alone; that on his return with the chloral appellant took it, and, attempting to put it in a bottle, spilled it, and Coleman returned to the drug store for another 10 cents worth of chloral; that the chloral was then mixed with beer and administered to the deceased several times; that the woman, Lillian Graves, returned to the saloon during the time the beer with chloral was being administered, and was about to drink some of it, but refrained after certain signs of disapproval from Coleman and appellant, she disclaiming that she knew anything of their purpose; that by this time deceased became very drowsy, and the woman left the saloon, leaving Coleman, appellant, and the deceased there; that appellant then locked up the saloon, turned out the lights, went through the pockets of deceased, who was then sleeping soundly, took his money, gave Coleman $2.50 of it; that appellant and Coleman then attempted to arouse deceased from his slumber, but being unable to do so, carried or dragged him to the side door opening on a street and put him out, deceased falling on the sidewalk when they turned him loose; that appellant and Coleman then shut and locked the door and went out through a rear door, proceeded northeast together four or five blocks to Main Street, where they separated; that about 10 o'clock the same night the deceased was discovered on the sidewalk at the side door of the saloon bareheaded and breathing but feebly, and died a few minutes later; that several officers assembled where deceased

was lying, and there was evidence from one of them that he found the cap worn by deceased tightly wedged under the door of the saloon, but no one else saw it, and he did not claim to have called attention to it in any way at the time he pulled it out. The evidence relied on by the prosecution to establish the foregoing facts was furnished by Bob Coleman and Lillian Graves except as to the incident concerning the finding of the cap and the two purchases of morphine by Coleman, which were proved by the druggist, who testified that the purchases were about one-half hour apart, and that the first purchase was about 7 p. m., and that both occurred between 7 and 8 p. m. The witness Lillian Graves claimed that when she left the saloon the second time it was about 8:30 p. m., while Coleman stated that he and appellant closed the saloon and left about 8 p. m. The State also proved that about one-half grain of morphine was found in the stomach of deceased, but that it could not be determined how much he may have had, as absorption continued as long as he lived; that two grains of morphine would kill an ordinary man, but that if whisky or beer were in the stomach, it would require more; no traces of chloral were found in the stomach, and no examination made with a view to detect its presence.

"While we have not undertaken to state the evidence relied on by the State, we believe we have stated enough of the facts as viewed from the standpoint of the prosecution to give a correct conception of the theory of the State; and we now desire to very briefly set forth the theory of the defense and contrast it with that of the prosecution. In brief, the contention of appellant in the trial court was that deceased came to his place of business and made a display of money, in the presence, and at the time under the circumstances contended for by the prosecution; that he was several times served with beer, sometimes by himself and sometimes by Bob Coleman, but that he at no time administered to deceased any beer or other drink with morphine in it or any other substance, and none was so administered by Coleman at his instance or with his knowledge, and he in no manner attempts to account for the traces of morphine found in the stomach of deceased, except on the theory that he may have been addicted to the morphine habit, as to which certain evidence was offered and excluded by the court. Appellant likewise denies all knowledge of the administering of chloral in beer to the deceased, and contends that the chloral was administered by Coleman, without his knowledge, procurement, or consent, and in his absence from the saloon, and that the deceased in fact died from the effects of the chloral, and not morphine; that after the deceased had remained in the saloon with Coleman, the woman Lillian and himself, for some half hour or so, he left, following the woman shortly after she left; that thereupon he himself left to go to supper, Coleman remaining in charge of the bar, as he was sometimes wont to do; that as he left, about a block from the saloon he met his brother, Dallas Rupe, who was a newsboy,

going to the saloon to deliver a Kansas City paper, and informed him he was going to supper and passed on, but presently his attention was attracted by some persons a half block or so to the west, who were quarreling; that he turned over to where they were and walked back the length of a block with one of them, which put him in the neighborhood of his saloon, and as he passed by the door he met his uncle, S. C. Rupe, just stepping into the saloon; this was about 7 p. m.; he and his uncle stepped just within the door and it was proposed that they go to supper, and they immediately left, without sitting down at all; that when they thus left the saloon to go to supper there were in the saloon Bob Coleman, Dallas Rupe, the newsboy brother, and the deceased, Randall, who had returned to the saloon about the time Dallas Rupe arrived with the paper, as above explained; that appellant and his uncle went up Main Street to a restaurant some four blocks distant for supper, and did not return till about 8 p. m.; that almost immediately after appellant and S. C. Rupe went to supper Coleman proposed to the deceased, Randall, that he would go out and bring in the woman Lillian, for whom deceased was asking, and left the saloon for a few minutes, Dallas Rupe and the deceased remaining; that on his return Coleman dissolved something in a beer glass that resembled chloral, telling Dallas Rupe he was going to have some fun out of the "old man," meaning deceased, who was in the rear room, and he filled the glass in which the substance aforesaid was dissolved and served it to deceased; that after a few minutes Coleman again left the saloon, and on his return a few minutes later he again served beer to the deceased; all this occurred while appellant and his uncle were at supper; that they returned from supper at about 8 o'clock and found the deceased, Dallas Rupe, Bob Coleman, and the woman Lillian, who had in the meantime returned, all at the saloon; that Dallas Rupe and the uncle then left to go home, leaving appellant, Coleman, the woman, and deceased at the saloon; that they remained there for a while, all drinking at intervals, till Jim James came in, somewhere near 9 p. m.; that a few minutes after his arrival the woman left, and almost immediately the deceased followed her with a declaration as to his purpose, and did not again enter the saloon; that Jim James then left, leaving only appellant and Coleman in the saloon; that as soon as James left appellant locked up the saloon and he and Coleman proceeded together for two or three blocks, and then on some pretext turned back and appellant did not again see him; that shortly after 9 p. m., Lillian Graves, the woman above named, who lived about half a block or so from the Rock Saloon, went into an adjoining room to borrow some camphor, declaring that an old man in her room had had a fainting spell; half an hour or so later she returned and said she was but joking about a man in her room fainting; her declaration to another woman to the effect that she had got all the old s— of a b— had and put him out, was testified to.

It was also in evidence that Bob Coleman was seen near Lillian Graves' room after the saloon was closed. The deceased was found in a dying condition at the saloon door about 10 p. m., as above stated. It will be noted that on the theory of the defense, Jim James went into the saloon the second time, the woman Lillian was there at about 8:30 to 9 p. m., instead of the first time, about 6:30, as claimed by the State on the evidence of the woman and Coleman. If this is true, then deceased followed her out about 9 p. m. and never returned. If, therefore, the contention of defendant is correct, no explanation is offered except as above suggested, as to the presence of morphine in the stomach of deceased; but the chloral is shown to have been administered by Coleman alone during the hour that defendant was at supper. Thereafter, at about 9 p. m., deceased followed the woman Lillian to her room, and from the effects of the drugs administered by Coleman, probably with her help, he became stupefied, and they called for camphor for use in arousing him, but being unable to do so, she and Coleman took him to the side door of the saloon, having robbed him, and left him where he was subsequently found. This theory is corroborated by the evidence of the State, which is the only evidence on the point, and is uncontradicted, that morphine usually produces its effect in fifteen or twenty minutes, while the uncontradicted proof in this case is that the morphine, if given at all, was administered about 6:15 to 6:30 p. m., and certainly before 7 p. m., while at between 8 and 9 p. m. the deceased was up and walking about. The uncontradicted and only evidence on the points also showed that there was no intent to kill or do serious bodily injury to the deceased by the drugs administered to him, but the only purpose was to put him to sleep for the purpose of stealing from his person, and that neither chloral nor morphine are necessarily poisonous, or even injurious, when taken into the stomach; it depends on the manner and quantity used."

*E. B. Muse* and *Jos. E. Cockrell,* for appellant.—"The following questions suggest themselves: Did the deceased die from the effects of morphine, or was it from chloral, or from the combined effects of both? If from the effect of chloral alone, without aid from morphine, was defendant in any way a party to the administration of chloral? If he administered morphine, but had nothing to do with the chloral, and if the deceased would not have died from the morphine, but did die from the combined effect of both, how is appellant guilty of any offense other than the unlawful administering of poison with intent to produce injury? And how could such unlawful act, not murder itself, be converted into murder by the fact that appellant may, after Coleman administered the chloral without his participation, have been guilty of theft from the person? Again, are either chloral or morphine 'technical poisons' within the meaning of the statute making all murder 'by poison' murder of the first degree? If morphine is, but chloral is not,

and the deceased died from the combined effects of both, administered by appellant, is the latter guilty of murder 'by poison?' If chloral and morphine may or may not be deleterious or poisonous, and if whether they are or are not poisonous or 'poisons' depends on the quantity and manner of their use, and if appellant did administer them to deceased, but did not intend to use them as 'poison,' but by accident or mistake in the manner and quantity used they in fact produced death, is it necessarily homicide 'by poison,' as contemplated by the statute? Or is it murder perpetrated in the attempt to commit a felony, the degree of which should be determined by the jury?

"The court erred in admitting over the objections of defendant the evidence of the witnesses Carson, Miller, and others relating to experiments made with the cap of deceased in shutting the saloon door on it.

"Evidence of experiments or illustrations made for the purpose of testing the truth or falsity of statement of witness who testifies at the trial to material facts can only be admitted when it is shown that the conditions, surroundings and circumstances were in all respects the same, or similar, to the conditions, surroundings, and circumstances existing at the time to which the testimony of such witness relates, and until such identity or similarity is affirmatively shown by the party offering evidence of the illustrations or experiments, it is error to admit it, and still more is such evidence improper when it affirmatively appears, as it does with respect to the matters here complained of, that the circumstances and conditions were dissimilar. Gill., Ind. and Coll. Ev., sec. 66, p. 94; Cohn v. Brelsford, 161 Mass., 61; Clark v. State, 40 S. W. Rep., 992; Alabama G. S. R. Co. v. Collier, 112 Ala., 681.

"On an issue as to whether a deceased person was addicted to the use of morphine, it is competent to prove by his general reputation in that particular that he was given to that habit.

"The testimony of several witnesses may be used to establish a state of facts on which an expert may base an opinion, although no one of such witnesses alone has knowledge of sufficient facts to base an expert opinion upon.

"When a medical expert professes an ability and willingness on a hypothetical statement of facts submitted to give an expert opinion on a medical subject, provable by such expert testimony and declares that the hypothetical facts presented are sufficient to base an opinion on, a trial judge who is not shown himself to be himself an expert can not properly pass on the facts and delare them insufficient to base an expert opinion upon, for he would thus invade the province of the jury, which alone is entitled to pass upon the credibility of witnesses and the weight to be given their testimony. Harbeck v. State, 43 Texas, 242; Williams v. State, 14 Texas Crim. App., 102; Moore v. State, 15 Texas Crim. App., 1; Lilly v. State, 20 Texas Crim. App., 1.

"The acts of the confessed accomplice, Coleman, the day following the homicide—that is, his going into hiding in the river bottom, were admissible as independent, relevant, and material evidence tending directly to connect said Coleman with the homicide without connecting appellant, and it was not proper to let him escape impeachment on such material evidence by equivocal, unfair, and untruthful answers on cross-examination.

"Said acts of Coleman (his flight, etc.) being provable by defendant as independent facts pointing to his guilt, he should not have been limited to proving the facts by Coleman himself, but should have been permitted to prove same by the witnesses Speers and Lowe, their evidence being competent and proper for the double purpose of impeaching Coleman's evidence and showing his guilty connection with the homicide. Dubose v. State, 10 Texas Crim. App., 230; Aiken v. State, 10 Texas Crim. App., 610; Hardin v. State, 4 Texas Crim. App., 358; Hart v. State, 22 Texas Crim. App., 563; Williams v. State, 22 Texas Crim. App., 497.

"The court erred in the charge in instructing the jury that if the death of deceased was produced by morphine or chloral, or both, administered by appellant, and if said substances were poisons, or constituted a 'noxious drink' when mixed with beer, and were administered for the purpose of enabling appellant to steal from the person of deceased, appellant would be guilty of murder in the first degree, although the quantity and manner of the use of said drugs may have been an accident or mistake. And the court further erred with respect to said matters in refusing to give special charges requested by appellant, presenting the theory, and supported by the evidence, that morphine and chloral are not 'poisons,' and that the homicide might be murder of the second degree.

"All murder of the first degree must come under article 606, Willson's Penal Code, and the offense with which appellant is charged, if murder in the first degree, must come under the subdivision 'poison' of said article; if not under that head, the offense can not be per se murder of the first degree.

"If appellant's offense be brought within the provisions of articles 542, 543, and 544 of Willson's Penal Code, it is no longer murder in the first degree per se, but it would be murder of the first or second degree, to be determined by the jury under proper instructions.

"Murder accomplished by the administration of a 'noxious potion' is not per se of the first degree, but to constitute it such the 'noxious potion' must have been a 'poison.'

"The statute making murder by poison murder of the first degree refers to 'poison' intentionally used as a 'poison,' and does not include murder by a 'noxious' substance not used for the purpose of poisoning, or to harmless drugs that by accident or mistake in the manner of their use have produced death.

"The question for your decision under this branch of the case is a clear cut legal one, the facts being undisputed. The bill of exceptions establishes that the tendency of the evidence was that neither morphine nor chloral were necessarily poisonous, but became so only when used in excessive quantities; that both are useful drugs, much used for medicinal purposes as sedatives, etc. As many as 900 grains of chloral have been taken without resulting in death. The simple question is, will the definition of murder in the first degree, found in article 606, Willson's Penal Code, making murder by 'poison' ipso facto murder in the first degree, be so enlarged by construction or by judicial legislation (it would be nothing less) as to also embrace murder by the methods named in articles 542, 543, and 544, Willson's Penal Code? Did the Legislature mean that all murder by 'poison, or by any noxious potion or substance' is murder in the first degree, or did it mean, as is plainly expressed, all murder by 'poison' is murder in the first degree, and all murder not of the first degree is murder of the second degree?"

*D. E. Simmons,* Acting Assistant Attorney-General, for the State. [No briefs for the State found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and prosecutes this appeal.

The indictment contained five counts. The conviction, however, was applied to the fifth count, so it will only be necessary to notice the points arising under said count. The theory of the State, which was supported by evidence, was that appellant and one Bob Coleman, acting together, poisoned deceased, A. T. Randall, by giving him morphine and chloral (one or both) in beer, which caused his death, and that this was done for the purpose of committing a felony, to wit, theft from the person. This occurred at the appellant's saloon. The accomplice, Bob Coleman, was the main witness for the State. By his testimony the actual administration of the morphine and chloral was proven. Morphine was administered first, some time between 6 and 7 o'clock in the evening. About 8 o'clock chloral was procured at a drug store near by on two occasions—120 grains each time. It is not clear whether the first chloral procured was given, as the testimony suggests it may have been all or partially spilled. A short while thereafter a like quantity was procured, and deceased appears to have drank some of this in his beer, and remarked it was too bitter and he could not drink it. Somewhere about 8 o'clock, or shortly afterwards, deceased appears to have been affected by the drugs administered. He was in a comatose condition, and appellant and Coleman put him out of the saloon, where he was shortly afterwards found dead. The testimony of the State also shows the administration of the drugs was for the purpose of stupefying and rendering deceased unconscious, so that the parties

might steal money from him which he exhibited in the saloon. A post mortem of the body of deceased showed that about a half grain of morphine was discovered in the stomach. The expert could not state accurately how much had been taken in the stomach, as he could not tell how much had been absorbed. The testimony of this expert showed: That a lethal dose for an ordinary man was about two grains. That how much it would take to kill in particular cases would depend upon the constitution, habits, etc., of the person. That morphine was not necessarily poison, and need not necessarily produce death. That it depended upon the manner of its use and the quantity, as well as the habits of the individual and his condition. It had its effect in ordinary cases in fifteen or twenty minutes, sometimes longer. No chloral was discovered, and no tests were made for the same. That chloral is also a hypnotic. He could not tell how much it would take to kill. In exceptional cases as much as 900 grains had been given without fatal results. The State also introduced other evidence tending to corroborate the accomplice as to some of his testimony—among others, the testimony of Lillian Graves. As to her, some of the testimony suggested that she might have been an accomplice. In defense appellant insisted on the weakness of the State's case. It is particularly insisted that under the evidence, chloral was the cause of the death, and that the testimony showed defendant was not present when the chloral was administered, and that he was in no wise responsible therefor. Defendant asked charges covering these phases of the case. He also urged that the testimony showed morphine and chloral were not necessarily poisons; that they were administered with no intent to take life, but merely for the purpose of stupefying or putting deceased to sleep so that they might take his money; and that, if appellant was responsible for the death at all, he was entitled to a charge on murder in the second degree; and he excepted to the refusal of the court to give such a charge. Enough of the facts have been stated to present and discuss the bills of exceptions reserved.

On the cross-examination of Bob Coleman, he was asked, if on the next day after the homicide, which occurred at night, he did not go to the Trinity River bottom, and on the evening of that day if he did not meet Sam Spears, and give Spears a silver dollar, and ask him to go to town and get him (Coleman) something to eat, and if Spears did not subsequently return to the bottom where Coleman was, and tell him that his brother, Jim Coleman, sent word for him to come to town. The witness at first denied this, but subsequently stated it was the second day after the killing of the deceased that he was in the bottom, and the occurrence inquired about happened. Appellant then proposed to introduce Sam Spears, and prove by him that it was on the next day after the homicide, or the next succeeding day after the homicide, that he met Bob Coleman in the Trinity bottom, and the events inquired about

happened. In this connection it was further proposed to prove by one Lowe, who accompanied Sam Spears to the Trinity bottom, where said Spears met Bob Coleman, that it occurred on the day immediately succeeding the homicide. This testimony was refused to be admitted by the court, and appellant assigns this as error. Now, it will be noted that the witness Coleman did not deny going to the Trinity bottom, and what occurred between him and Spears. He merely denies that it occurred on the next day, and appellant proposed to contradict him as to time. We do not consider this matter material, so as to afford the basis of a contradiction. It was something that happened after the accomplishment of the conspiracy, and not before its consummation or during its accomplishment. If the guilt of Coleman, the accomplice, was a disputed fact, and by his testimony he was endeavoring to lay the whole transaction on appellant, then his flight might become a very material circumstance. But here he admits his connection, and admits his flight and concealment in the Trinity bottom; and whether it was the next day or the day after, it occurs to us, is immaterial.

Appellant offered to prove by the witnesses Duncan, Pendleton, and Day that they were acquainted with deceased, and that he bore the reputation of a morphine eater. Duncan stated: That deceased had been a school-teacher near Meridian, and that deceased stayed at the hotel kept by witness for several days a short while before his death. During this period he observed the conduct of deceased, and that it was peculiar. That he appeared to be in a stupor when in the house, and at times would sit around seemingly in a stupor. That he appeared to have no appetite, and that he had a peculiar expression out of his eyes, and that he was sullen and morose, and from his manner and conduct it was the opinion of the witness that Randall was addicted to the morphine habit. That he had observed during thirty years past other persons addicted to that habit, and he judged from the manner of deceased he was addicted to it. On cross-examination this witness indicated: That he had noticed three persons during thirty years, and one of them he saw for several years about once a month. Another one he saw in a store in the town where he went to trade. As to the last two, he did not know whether they used morphine. Witness could not tell how morphine affected the appearance of a person—whether it dilated or contracted the pupils of the eyes, and what effect it had upon the complexion or facial expression. He was simply judging from general appearances and stupor. That whisky produced the same stupor, as far as appearances, as morphine. That he did not know whether or not Randall had been drinking whisky. Did not know whether his condition was produced by whisky or morphine. By Pendleton he proposed to prove merely that the reputation of deceased in the community was that he was addicted to the habit of using morphine, or an opiate of some kind; that before appellant came to his house he was on a spree in town; that the conduct of deceased was peculiar, as he observed it,

and that he appeared to have no appetite, and was of a sullen or morose disposition, stayed about the house nodding in the daytime, even when he arose in the morning, talked and muttered to himself, and at night would cry out in his sleep, and that his eyes had a peculiar look, and the school children complained about his peculiar muttering to himself and other unusual conduct; that he inquired in order to ascertain whether deceased was a morphine eater, and went to the doctor and asked him about it, and the doctor told him he did not sell him any and did not know of his using any; that he was a nervous and feeble man. This witness further stated he did not know the effects of morphine or opiates; that there were only three or four Americans in the community where deceased was teaching school at the time, and his reputation was confined to them. By the witness Day it was proposed to prove: That deceased was in his house for a day or two. That his conduct was very peculiar, and in the nighttime he acted like a crazy man. Waked witness after he had been asleep, raving and hallooing. He might have been drunk. Witness could not say he had not been drinking, and that his acts would not be produced by drinking, but he acted differently from any other drunken man. None of these witnesses testify that they had ever seen or known of deceased using any opiates or morphine. As stated, the court refused to permit the introduction of this testimony, which appellant insists was admissible for the purpose of accounting for the morphine found in the stomach of deceased after death. In support of his contention appellant cites to us to several authorities which authorize the introduction of the character of the deceased in certain cases of homicide, as being a dangerous man, etc., and contends that by analogy this sort of testimony is admissible. If this was a matter provable by character, as that deceased had the reputation of being a morphine eater, we do not believe the witnesses show themselves sufficiently conversant with the reputation of deceased in that respect. But we do not believe this is a matter provable by reputation, independent of any testimony at all showing that deceased actually ate or used morphine or other opiates. If we recur to the record, there is no testimony tending to show that at the time or shortly before the death of deceased he took any morphine voluntarily—much less, that he took any with suicidal intent. The evidence does not even suggest this. In connection with this testimony appellant also proposed to show by Dr. Thomson, a physician, that from the testimony of said witnesses it was his opinion deceased was a morphine eater. It appears, however, this witness was not in court at the time. Waiving that, still, if the testimony on which the hypothetical opinion was to be based was not admissible in evidence, then the opinion could not be given, because there was nothing in the case upon which to found it.

As an inculpatory fact against appellant, the State proved by Jack Cabell: That a few minutes after deceased died he went to the body,

lying close to the door of the saloon. Found the cap of deceased in the north corner of the door, wedged in under the door. That he pulled it out. It was wedged in tight. It was not in loose  It was in tight.  That he examined the door, and the cap could not have been pushed in from the outside.  Subsequently the State was permitted to prove, over the objections of defendant, by witnesses Carson and Miller, that they went to the saloon in question and took the cap of deceased with them; that it was mashed flat, caused by being shut in under the door of the saloon kept by defendant, in which the poison was thought to be administered to deceased; that witnesses put the cap down within the door of the saloon at which it was said to have been found, same being mashed down behind, and that witnesses then jerked the door to, and the cap caught under the door at the place and in the manner as State's witness Jack Cabell had stated he had found it on the night of the homicide.  This experiment was repeated as many as four times, and every time the cap caught under the door in the manner aforesaid. Appellant objected to all of said testimony, for the reason that it was incompetent to bind defendant by the aforesaid tests, and that the condition were not proved to have been the same as at the time of the murder, nor was the door shown to have been in the same condition; nor did the evidence of the State show how the cap was lying or where it was with reference to the door on the night of the homicide when it was claimed to have been caught under the door.  Nor was it shown that the cap was then mashed down behind as it was at the time of the said experiment; but, on the other hand, the proof showed it was mashed down by reason of its having been caught under the door.  And said experiments did not show whether the cap in its natural condition would have been caught under the door or not; and in fact the experiment was made with the cap as it would have been in its natural condition when worn on the head.  Defendant further objected to said testimony, because it was purely conjectural, and defendant was not present at said experiments, and he in no manner could be bound thereby.  In explanation the court says: "Defendant swore that he closed the door and no cap was under it, and he further swore that nothing could get under the door thicker than a sheet of paper."  It will be noted as to this bill it is stated, as a ground of objection to the admissibility of this testimony, that the experiment was not performed under the same conditions with reference to the door and cap as when the same was first found by the witness Cabell.  To have been a good bill, we think it should have distinctly shown, as a matter of fact, the character of cap; its condition at the time; the kind of door, and its condition at the time; and then shown the condition of the cap at the time the experiment was made and the condition of the door, so as to have shown by the facts that the experiment was not performed under the same or nearly similar conditions, as we understand the rule to be.  That is, the bill must show in itself that the testimony was not admissible.  Now,

as far as we are advised, we do not know what kind of cap this was. There are various kinds of caps, some stiff and some soft, which when worn on the head fall flat. For aught that we know, the cap in question may have been of this character. The witnesses merely say the cap was mashed down and not in the condition as when worn on the head. In our opinion the bill does not disclose that the experiment was not made under similar or nearly similar conditions as existed at the time of the homicide. As has been frequently held, the grounds of objection stated—that the facts were not similar—is not a certificate by the judge to that effect. It further occurs to us that the rule invoked by appellant, that the conditions must be similar or exactly similar, is not the correct one. They must be similar or nearly so. See Clark v. State, 38 Texas Crim. Rep., 30. Appellant says this testimony was admitted for the purpose of corroborating Jack Cabell as to finding the cap wedged under the door, and was materially injurious to him. Cabell was not an accomplice, and required no corroboration, and as far as record discloses no witness controverted his testimony as to finding the cap wedged under the door. However, the court did not err in admitting the testimony; at least, error is not shown by the bill of exceptions.

The court only instructed the jury as to murder in the first degree. Appellant insists "the court erred in instructing the jury that, if the death of deceased was produced by morphine or chloral, or both, administered by appellant; and if such substances were poisons or constituted a noxious drink, when mixed with beer, and were administered for the purpose of enabling appellant to steal from the person of deceased, appellant would be guilty of murder in the first degree, although the quantity and manner of the use of said drugs may have been an accident or mistake. And the court further erred with respect to said matters in refusing to give special charges requested by appellant presenting the theory, and supported by the evidence, that morphine and chloral are not poisons, and that the homicide might be murder in the second degree." In his brief he has subdivided his objections under four heads, as follows: "(1) All murder of the first degree must come under article 711, Penal Code, and the offense with which appellant is charged, if murder in the first degree, must come under the subdivision 'poison' of said article; if not under that head the offense can not be per se murder of the first degree. (2) If appellant's offense be brought within the provisions of articles 647, 648, and 649, Penal Code, it is no longer murder in the first degree per se, but it would be murder of the first or second degree, to be determined by the jury under proper instructions. (3) Murder accomplished by the administration of a 'noxious potion,' is not per se of the first degree, but to constitute it such the 'noxious potion' must be 'poison.' (4) The statute making murder by poison murder of the first degree refers to 'poison' intentionally used as a 'poison' and does not include murder by a 'noxious' substance not

used for the purpose of poisoning, or to harmless drugs that by accident or mistake in the manner of their use, may have produced death."

Appellant insists that articles 647-649, Penal Code, do not make a murder by poison murder of the first degree, nor does it follow that, if one intending to commit a felony shall, through accident or mistake, do another act which if voluntarily done would be a murder, it would necessarily be murder in the first degree; and the statute making a murder by poison does not apply to this character of case. ·See art. 711. His insistence being that article 711 does not apply to this transaction, and that the court should have given a charge on murder in the second degree. In Tooney v. State, 5 Texas Criminal Appeals, 163, all these articles of our statute came up before the court for construction; and there it was held that the article which is now 711, which makes all murder committed by poison murder in the first degree, also embraces articles 647-649, this being construed also to mean murder by poison to be murder in the first degree. The court in speaking of these last articles say: "Evidently the object of this statute was to reach a class of cases about which doubts might arise when the general statute of murder was sought to be applied to them. Such doubts were more imaginary than real, in our construction of both statutes. It is to be noted that under these latter statutes 'the intent to kill' or 'the intent to injure,' are made to stand in lieu of and must be proven just as 'malice aforethought' under the general law, which, as we have seen, when explained, means nothing more nor less than the taking of life with the intention to do so, or when death results from an intention to do serious bodily harm. In either case, and under this latter as under the former statute, the malicious intent and its proof are not only the same, but are also the very gist of the offense. So utterly revolting to every sense of humanity is the use of poisons as means of injury to and for the destruction of human life, because of the cool, calculating fiendishness, the deliberate craftiness, with which they are administered, and the unsuspecting confidence with which they are necessarily taken by the innocent victim, that the law, in its efforts to suppress it entirely as one of the foulest of all crimes, denounces no halfway penalties against it after it has accomplished the destruction of a reasonable creature in being. Under these last statutes, if death ensues within one year it is murder; and it is murder in the first degree under the express terms· of our statutes, because committed by poison." And see Hedrick v. State, 40 Texas Crim. Rep., 532. No language could be clearer or more emphatic than this, and it accords entirely with our view in the construction of these statutes. Of course, the statute does not seek to create any new offense of murder, but merely to make all murder, whether of the first or second degree, when it is done by poison, murder of the first degree. Therefore it must be alleged in a case of murder by poison that the killing was done with malice aforethought, and this must be proven; and, whether the proof shows that the killing was done either upon

express or implied malice, it is made by the statute then equally murder of the first degree. The intentional administration of poison with intent to kill or inflict serious bodily injury is itself evidence from which malice can be inferred. Whart., Hom., p. 627. But, more than this, at common law, as well as under our statute, one intending to commit a felony, and in its commission, through accident or mistake, and beside his original intention, commits another felony, is as guilty of the last offense as if he had voluntarily done that felony. The intention to commit the original felony supplies the malicious intent as to the one actually committed. Mr. Wharton and Mr. Bishop both appear to concede this to be the rule at common law. Whart., Hom., pp. 58-60; 2 Bish., Crim. Law, p. 418, sec. 727, subdiv. 2. Both, however, appear to doubt the correctness and deplore the hardship in the application of this principle in special cases, but they concede that whenever this matter is regulated by statute the question is settled, as it is competent for the Legislature to do this. Now, we think it follows from our statutes with reference to homicide committed by poison, whenever it is shown that the poison was administered with malice aforethought—that is intentionally and with intent to take life or to inflict injury, the probable consequence of which might end in death, which malice is to be proved as in other cases by circumstances, whether it be express or implied malice—that it will be murder; and, being murder, our statute makes it murder in the first degree. Moreover, when we superadd to this the further proposition that the administration of the poison was with intent to perpetrate the crime of theft from the person (that is, to stupefy the party, and so to inflict injury upon him, in order the more easily to consummate the theft); that the party so engaging is perpetrating a felony; and if, in the consummation thereof, he takes the life of the person he is so attempting to stupefy, by the accident or mistake of giving too much poison—this is the perpetration of murder in the commission of another felony, the original felony itself evidencing the malicious purpose, and so, being murder of any degree, it being accomplished by poison, it is made by our law murder in the first degree. However, appellant says that morphine and chloral are not poisons; that small doses may be given and are frequently given as medicines and to ease pain, and they only become poisons when given in large doses. Grant it; this matter as to whether or not they were poisons as administered was submitted to the jury and they found as administered they were poisons and produced death. Again he says: Grant that appellant administered the morphine and chloral—one or both—he did not intend to kill upon malice at all; that he administered them merely as soporifics in order to lull his victim to sleep so that he might steal from him. In other words he insists there must be an intent to kill before there can be murder of any kind. He asked a number of charges on this subject contravening the charge given by the court. If there was any question of innocent intention here, as where defendant was in pursuit of a lawful

purpose and having negligently administered too much morphine or chloral, a very different question would present itself. But he was not in pursuit of a lawful purpose. He was in the pursuit of an unlawful purpose, to wit: theft from the person—a felony. His intention was mischievous in itself and was done deliberately. He was disregardful of the result and he used means calculated in themselves to inflict great bodily injury, the natural and probable consequences of which might result in death. This would have been murder at common law, and much more under our statute, which makes the intent to injure by poison supply the malicious purpose to kill. In other jurisdictions under statutes similar to our own, it has been held, where poison is knowingly administered with intent of mischief and to accomplish some unlawful purpose, if death ensue, it will be murder, although death was not intended, and these statutes, like our own, make it murder in the first degree. State v. Wagner, 78 Mo., 644; — Am. Rep., 131; State v. Wells, 61 Iowa, 629; 47 Am. Rep., 822; Ann v. State, 11 Humph., 111; State v. Dowdy, 19 Conn., 387. As we understand the law in this State, the intent to constitute murder must be to take life or inflict such injury the natural consequences of which may cause death. Here, although the testimony indicates that the parties did not directly intend the death of deceased, yet the natural and probable consequences of the poison administered, if in large doses, would be to cause death. We are not informed as to the quantity of morphine actually administered, but more than half a grain was found in the stomach. How much may have been absorbed or eliminated, is a matter of pure speculation; but the purpose of injuring the deceased is further manifest from the quantum of chloral given and the rapidity with which these doses both of morphine and chloral were administered. Without any evidence of skill on their part or knowledge of the quantity of the poisons necessary to produce sleep, only, they proceeded to the consummation of their purpose in a manner that manifests to our minds, and doubtless did to the jury, an utter disregard of the effect that the medicines might produce—their purpose being, as they stated, to stupefy so they might rob deceased. As Coleman terms it, they desired to "dope" deceased merely. That their purpose was malicious in that it involved the commission of a felony, and in that it involved the administration of poison, there can be no doubt; that they were inflicting an injury in disregard of the real effect it might produce on the deceased, is clearly evident. Therefore, we do not believe the court was called upon or authorized to give appellant's requested charges to the effect that if appellant's purpose was only to stupefy he would not be guilty of murder.

Appellant also contends that certain requested charges asked by him should have been given, instructing the jury that appellant could only be held responsible in case they believed death occurred from the administration of the morphine, and he would not be responsible if it

occurred on account of the administration of the chloral alone or of the chloral and morphine combined. We fail to see anything in the testimony as disclosed by the record that raises an issue of this character. The testimony is of that character that, if appellant is responsible for the death by morphine, he is equally responsible for the death of deceased by the chloral or by the morphine and chloral combined. The conspiracy was for one object and purpose, to wit, to steal the money from the person of deceased, which he had incautiously exhibited in appellant's saloon. The State's testimony shows that appellant was present and participated in the entire transaction; and the fact that he introduced testimony tending to show that he may have been present when the morphine was administered but was absent from the saloon at the time the chloral was given, does not present to our minds any reason why the court should have given appellant's requested charge on the subject. More than this, we think it is manifest that deceased died from the morphine. Nor can we agree with appellant's insistence that this could not be true, because he did not die earlier. According to the State's testimony he died within two or three hours of the first administration of the morphine. The fact that the physician testified morphine took effect in ordinary cases within from fifteen to twenty minutes, we think has no particular significance. The evidence shows that a good while before the death of deceased he showed signs of becoming sleepy. The books teach that in ordinary cases death usually ensues in from six to twelve hours. Mann on Forensic Med. and Tox., p. 553; 4 Whitthaus & Becker, Med. Jur., p. 729.

We have examined the record carefully, and think the charge of the court a fair one, presenting every essential phase of the case both for the State and defendant. The evidence in our opinion fully sustains the verdict of the jury. The judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]