## COURT OF APPEALS.

### Oct. 19, 1909.

## THE PEOPLE v. JAMES D. FARMER.

(196 N. Y. 65.)

(1). MURDER—MOTIVE AND RELATIONSHIP NOT SUFFICIENT TO WARRANT FINDING OF CONSPIRACY TO COMMIT HOMICIDE.

Motive alone is not sufficient to warrant a finding of a conspiracy to commit a homicide, nor are motive and relationship sufficient to warrant a conviction therefor.

(2). SAME.

On an indictment jointly with his wife for murder in the first degree, defendant had a separate trial. The case was tried and submitted to the jury on two theories: First, that the defendant himself was present and actually participated in the murder for which he was on trial. *Held*, that the record does not contain evidence that would justify a finding that defendant actually took part in the killing. Second, that the act was done by the defendant's procurement, counsel or command. *Held*, that although he may be guilty as a principal or an accessory in the forging of the deed, or he may be guilty as an accessory in the secreting of the body, the evidence does not justify his conviction as a principal in the homicide.

BARTLETT, J., dissenting.

APPEAL from a judgment of the Supreme Court, rendered October 31, 1908, at a Trial Term for the County of Jefferson, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*V. K. Kellogg* and *B. A. Field,* for appellant.

*F. B. Pitcher, District Attorney,* for respondent.

HAIGHT, J.:

The defendant, James D. Farmer, was indicted jointly with his wife, Mary Farmer, charged with having committed the crime of murder in the first degree, by the killing of one Sarah Brennan on the 23d day of April, 1908. They were awarded separate trials. Mary Farmer was first tried and convicted, and her conviction was affirmed in this court (194 N. Y. 251). In October last the defendant was placed upon trial, which resulted in a verdict of conviction, and we are now called upon to review the judgment entered upon that verdict.

The evidence tends to show that the homicide was committed in a building known as the old Barton Hotel property, in which the defendant and his wife were at that time residing, on Paddy Hill in the town of Hounsfield, across the river from the village of Brownville, N. Y., and about four miles distant from the city of Watertown. The decedent, Sarah Brennan, lived with her husband, Patrick Brennan, in a house next to that occupied by the defendant, separated by a yard about eighty feet across. Mr. Brennan took breakfast in their residence on the morning of the 23d of April, 1908, and at six o'clock left for the Globe Mills, his place of employment. At that time his wife was doing up her work and getting ready to go to Watertown, where she had an engagement with a dentist. At half-past nine o'clock Mrs. Brennan, fully dressed for the street, left her own house and entered that of the defendant, presumably for the purpose of having Mrs. Farmer join her in her trip to Watertown. Early that morning Mrs. Farmer went to Mrs. Blake's, another neighbor living near by, and asked her if she could leave her baby with her while she went to Watertown, and on being advised that she could, she brought the baby over to Mrs. Blake's and left it there during the forenoon and called for it a little after twelve o'clock. This was on Thursday. The following Saturday the Farmers, with the assistance of several neighbors, moved into the Brennan house, and among

the articles moved was a black trunk belonging to Mrs. Farmer, which was locked and tied up with a clothesline wound several times around it. At the time of the moving of the trunk Mrs. Farmer walked by the side of it and directed where it should be placed in the Brennan house. On Monday following the sheriff and several police officers called at the Brennan house, finding the defendant and his wife there, made a search, and in the trunk already described found the dead body of Sarah Brennan. The head and face were covered with cuts, and the skull was fractured to such an extent as to leave no doubt that her death was caused by violence. The defendant and his wife were then placed under arrest, charged with the commission of the crime. The defendant denied that he took any part in the killing of Mrs. Brennan, or that he knew that she had been killed until the trunk was opened by the sheriff and the body discovered.

On the 31st day of October, 1907, Mary Farmer took to a law office in Watertown the deed by which Mrs. Brennan obtained title to her house and lot, and asked to have a deed drawn conveying the premises to the defendant, James D. Farmer, and also a bill of sale of all of the personal property. The lawyer prepared the deed and the bill of sale and the same were signed by Mrs. Farmer in the name of " Sarah Brennan," and she so impersonated Mrs. Brennan in acknowledging the execution of the deed before the notary. On that evening she handed the deed and the bill of sale of the personal property to the defendant and he looked the papers over. On the 8th day of November thereafter the defendant asked his sister, Mrs. Doran, to take the deed to Watertown and have it recorded. She did so the following day, but on her way to town in the street car she examined the deed and subsequently went to the office of the attorney and had a conversation with the notary, and thereafter notified the defendant by telephone that if he wanted the deed recorded he would have to do it himself. He thereupon took

a street car, went to Watertown, met his sister, who told him what she had done and the inquiry she had made, and from the description given of the woman by the notary she believed that his wife, Mary Farmer, had signed and executed the deed and bill of sale in the name of Mrs. Brennan. The defendant took the deed from her and took it to the clerk's office and had it recorded. On that and on two or three other occasions she asked him to see Mrs. Brennan and find out if the deed was all right, but he refused or neglected to do so. Subsequently, under date of January 10th, 1908, he joined with his wife in executing another deed of the property to their infant child, Peter J. Farmer; but this deed was drawn by an attorney other than the one who had drawn the first deed.

On the morning of April 23rd, the day of the homicide, the defendant arose at 6:45 a. m. and was told by his wife that Mrs. Brennan had called that morning and wanted her to go to Watertown with her. After he ate his breakfast he walked up to Doran's house, arriving there at about 8:20. He found Doran engaged in laying a cement walk; and after a talk with him the defendant returned to his home, changed his pants and shoes and then returned to Doran's, arriving there fifteen or twenty minutes before nine o'clock, and went to work assisting Doran in laying the new walk. The evidence is conflicting as to the time that he remained at work at Doran's. A number of witnesses testified in his behalf, to the effect that he took dinner at Doran's and remained there until about five o'clock in the afternoon; still others think that he remained until in the neighborhood of two o'clock, when he went home with his wife and then returned again; while on the part of the People witnesses were sworn to the effect that he was seen going toward his home shortly after twelve o'clock, and by one witness that he was seen at his home at one o'clock. Somewhere between one and two o'clock Mrs. Farmer went to the Doran house, saw the defendant and handed him a bunch of keys, saying that

they were the keys to his place; that Mrs. Brennan had gone
away at half-past nine that morning; that she had gone to
Buffalo or Duluth, and that she had given the keys to Mrs.
Farmer to be handed to the defendant. On that occasion his
wife gave him a quarter and asked him to go to the mill and
notify Brennan that his wife had gone and that she had given
the keys to him. This he declined to do, stating that Brennan
would be through with his work at three o'clock, that he would
then return home and that he could then tell him. It further
appears that Mr. Brennan did arrive home that afternoon be-
tween four and five o'clock, that he found the house locked up
and was unable to find the key at the place where his wife
usually left it when she went out. He then went to the barn
and tried the barn door and found that locked. He finally
pulled the staple from the barn door and went in and got a
ladder, by which he climbed to the upper back window of his
house, raised the window, went in and down stairs, from which
place he was enabled to open the parlor door which was locked
with a key on the inside. He then commenced taking down
the storm-house or porch, which was in sections, and packing
it away in the barn. While thus engaged, the defendant came
up to the fence between the two lots and says to him, as ap-
pears from the testimony of Mr. Brennan, " Brennan, don't
you know I bought this place? Says I, No, sir. I says, when
did you buy this place? He says the 31st day of October, 1907.
I says, what did you pay for it? and he says, $2,100. Well,
I says, if you bought it last fall, and I says I built a new coal
box here, put on storm windows, storm porches and done other
repairs, why did you not say so then. He says, because your
wife was paying rent. I says, is she paying you rent now, and
he says, yes, sir. And I says, how is it that you spoke about
it now? Well, he says, I told her to-day we wanted her to
vacate, I want to move in. Says I, Jim Farmer, I spoke to my
wife about that and she told me she never sold it to you or your

wife, nor would I believe a word you say. I says, I have asked my wife in the presence of other people that came here to ask me about it and I says, she told them the same thing she told me. Then he says, your wife told me to tell you to pack up her two trunks and your girl's oil painting pictures and have them sent up on the stage to 16 Griffin street this city. Says I, Jim Farmer, my wife was here this morning when I went away and if she wanted that done, she knew what she wanted better than I did and she knew when the stage went and she would have sent them up there without telling you to tell me. I would not believe a word you say." Brennan remained in the house that night, and the next morning went to his work as usual. The defendant and his wife went to the law office of Mr. Burns, at Watertown, and had a notice drawn requiring Brennan to quit the premises. This notice was served upon Brennan by a constable that evening upon his return from his work. He again remained in the house over night, leaving the same in the morning intending to go to work, but soon after changed his mind and returned to the house and found the defendant and Mrs. Farmer therein engaged in eating their breakfast. He then changed his clothes, went to Watertown, called at the places where his wife usually visited and was unable to get any trace of her. In the afternoon he returned to his residence, in company with a detective, and then found that the defendant and his wife had in the meantime moved their things over from the other house and were in full possession. Matters thus rested until Monday when the search was made, to which allusion has already been made, resulting in the finding of the body of Sarah Brennan.

I have thus given a brief history of the transaction, about which there is no substantial dispute, except as to the time that the defendant was at work at the Doran house, and the claim of the defendant that he stated the price paid for the house and property at $1,200, instead of $2,100.

The case was tried and submitted to the jury upon two theories: First, that the defendant himself was present and actually participated in the killing of Mrs. Brennan; second, that the act was done by his procurement, counsel or command. Upon the trial the evidence was carefully limited, by the trial court, to the acts and declarations by the defendnt. The confession made by Mrs. Farmer at the time of the discovery of the body was, upon the objection of the district attorney, ruled out, thus leaving the jury upon this trial without any information as to what took place in the house of the defendant after Mrs. Brennan entered the same at half-past nine o'clock of that day.

The first question that it becomes necessary to determine is as to the time that the killing took place. Two or three of the witnesses have spoken as to the time that Mrs. Brennan was seen to enter the Farmer house on the morning in question, and they all substantially agree. This was the last time she was seen alive by any of the witnesses. At that time she was fully dressed for her purposed trip to Watertown and had evidently started for the street cars upon the opposite side of the river, and, according to arrangement, called for Mrs. Farmer to accompany her. Mrs. Farmer, it appears, had prepared for the occasion. She had as early as eight o'clock taken her baby to Mrs. Blake's to be cared for during her absence. And it must be borne in mind that Mrs. Brennan had an appointment with a dentist, which she purposed to keep. It is apparent that she had not removed her coat nor her other garments, for they were all about her as her body was crowded into the trunk, with the exception of her hat, the frame of which was subsequently found in the stove. It is said that it would take five or six hours for ham to digest, and that upon the *post mortem* examination it appeared that the breakfast that she had eaten had been fully digested. It is true that Mr. Brennan testified that the breakfast consisted of fried potatoes, ham and eggs, coffee and toast;

that his wife breakfasted there with him, and then in answer to a question propounded by the district attorney as to whether he saw her eat all of the articles he mentioned, he answered in the affirmative. He, however, was not asked as to whether he specially saw her eat of the ham, and his attention does not appear to have been drawn thereto except by the general question. What she ate was a matter of trival importance which would hardly attract the attention of any person under similar circumstances. If Mrs. Brennan partook of the other food upon the table, omitting the ham, complete digestion would probably have taken place within the three and a half hours that had intervened before she entered the Farmer house. Upon the trial of Mary Farmer we were fully advised as to what took place and the time, by her confession. But that we have not before us for consideration in this case, and, therefore, the question must be determined from the meagre circumstances disclosed. It is quite evident that the killing took place before Mrs. Farmer went for her baby at Mrs. Blake's. This, as we have seen, was a quarter after twelve o'clock. She then asked the Blake girl to come over to her house and attend the baby, which the girl did a while thereafter. It is hardly conceivable that Mrs. Brennan, who had an appointment with the dentist, would have entered the Farmer house at half-past nine, fully dressed for her journey, and then would have sat quietly by until twelve o'clock or after before proceeding on her journey. It consequently appears to me that the homicide probably took place in the morning shortly after the arrival of Mrs. Brennan.

Was the defendant present at the homicide? As we have seen, he had changed his clothes and returned to Doran's for work fifteen or twenty minutes before nine o'clock. They were laying a cement sidewalk in front of Doran's house. It was evidently something of a novelty in that community for it seems to have attracted the attention of nearly every person in that vicinity. Many witnesses were called and swore that they saw

the defendant there at work during that forenoon. If the witnesses are accurate with reference to the time, the defendant must have gone to Doran's to work at least three-quarters of an hour before Mrs. Brennan entered his house on her way to Watertown. None of the witnesses saw him leave his work during the forenoon. Angeline Premo says she saw him returning with his wife, she thinks between eleven and twelve o'clock, but Pearl Chapman and Nina Finnucan, two young girls, say they saw him while they were at the dinner table, which was shortly after twelve o'clock. Inasmuch as Mrs. Farmer did not go for her baby until after twelve o'clock, it is quite possible that the Premo woman is slightly mistaken with reference to the time that she saw the defendant and his wife.

After reading the entire evidence and giving it careful consideration, I have concluded that the record does not contain evidence that would justify a finding that the defendant was at his home between the hours of nine and twelve o'clock of that day, and inasmuch as the homicide probably took place shortly after half-past nine, it follows that the defendant did not actually take part in the killing of Mrs. Brennan.

Was the homicide by the defendant's procurement, counsel or command? We have no evidence of any conversation that took place between himself and his wife pertaining to the killing. It is true that he had a motive. The deed from Mrs. Breenan ran to him and he had it transferred to his infant child. He had been warned at least three times by his sister that there was something wrong with the deed. She had requested him to see the Brennans and ascertain if it was all right, but these requests had been disregarded. He claims that his wife had money with which to pay for the place, and gave us the talks that he had with her upon other occasions with reference to buying other property at different times, and also tells us that his wife stated to him that she had money from Buffalo and from a priest. But none of these claims were veri-

2

fied or proved to have any foundation whatever. This defendant and his wife were both evidently very poor. Their belongings in the house were of the most meagre character, and it is apparent that they welcomed an opportunity to get a meal from their neighbor's; even on Saturday morning they waited for their breakfast until after Brennan had left his house, and then they entered and partook of his accumulated stores. I, therefore, am not impressed with the claim of the defendant that he believed that his wife had funds with which to purchase the place. He was advised by the warning of his sister and yet thereafter executed the deed to his infant son, thus uttering the title which he had been warned against and had reason to believe to be forged. But motive alone is not sufficient to warrant a finding of a conspiracy to commit a homicide. It is true that the body was found upon the premises occupied by him and his wife. But was it by his act? This question we have already considered, and reached the conclusion that he was not present at the commission of the act. He may, however, have arrived in time to assist in the secreting of the remains, and this may account for the tiny piece of flesh, of the size of the head of a pin, that was found upon his pants, and the hairs in the trunk. But the assisting in the secreting of the body after death would not make him a principal, but would only leave him liable as an accessory after the fact. Apparently the defendant was a man of moderate intellect and possessed fair judgment when sober, but he was given to the use of intoxicants to such an extent that on every occasion when he could get the money with which to purchase liquor, it was spent for that purpose and he had virtually become an habitual drunkard. Mrs. Farmer is described as a strong, rugged woman. She appears to have originated all of the plans that had been talked over with reference to the purchasing and acquiring of property. She carried the purse and expended the money that he had from time to time earned and he was compelled to rely

upon her for whatever he had to eat or drink. That she was the ruling power, and to a large extent controlled him in his actions, is quite apparent. It was her mind that planned the scheme for getting title to the house and lot owned by Mrs. Brennan. She took the deed to a lawyer who was not acquainted with her and procured him to draw a deed to the defendant, herself impersonating Mrs. Brennan in signing and acknowledging the same. It was her mind that devised the bill of sale of the personal property, the household furniture, goods and provisions. It was she who procured the confidence of Mrs. Brennan who had become her daily visitor and confidant, thus enabling her to have access to Mrs. Brennan's house and papers. It was her hand that struck the blows that destroyed the life of her friend; and it was her mind that evidently planned the homicide, to the end that she, her husband and son could possess the property which she so much coveted.

It is possible that the defendant knew of her plans and her intended act. It is possible that he counseled, advised and procured her to do the act, but where is the evidence to be found? True, he had the motive; he, with her, was to gain a comfortable home; he also was her husband, living with her. But, as we have seen, motive and relationship are not sufficient to warrant a conviction. He may be guilty as a principal or an accessory in the forging of the deed; he may be guilty as an accessory in the secreting of the body. But I am not satisfied that the evidence justifies his conviction as a principal in the homicide.

The record contains many exceptions that were taken to the admission and rejection of evidence, but, in view of the conclusion that I have reached upon the merits, I do not deem it necessary to consider them.

The judgment and conviction should be reversed and a new trial ordered.

EDWARD T. BARTLETT, J. (dissenting):

I am unable to agree with the conclusion reached by Judge HAIGHT, to the effect that the conviction of the defendant, James D. Farmer, should be reversed and a new trial ordered.

I am of the opinion there is abundant evidence to establish the fact that the defendant acted as a principal with his wife, Mary Farmer, from the forgery of the deed in October, 1907, until the murder of Sarah Brennan and the discovery of her body in the trunk in April, 1908. The fact is undoubtedly established that the defendant was not present when Mary Farmer killed Mrs. Brennan, but the People submitted evidence that justified the jury in finding that he arrived on the scene less than three hours thereafter, and must have participated to some extent in the grewsome details incident to concealing the body of the victim and removing the evidences of the crime. This degree of participation, however, is not of vital importance.

Section 29 of the Penal Code thus defines a principal: " A person concerned in the commission of a crime whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a principal."

The murder of Mrs. Brennan was no sudden impulse that induced Mary Farmer to take her life; it was on the contrary a necessary part of a deliberate and wicked scheme originating in the forgery of the deed in October, 1907, and consummated by the murder in April, 1908. The death of Sarah Brennan was the key to the situation. Without it the actions of the defendant and his wife were purposeless and utterly without meaning; her removal by violence was the mode provided by these conspirators to place them in possession of the leasehold interest and the personal property of the Brennans. The actions of the defendant and his wife after the homicide render it clear that such was the fact. They moved very soon into the

house of the Brennans, took possession of the personal property, informed the husband of the murdered woman on his return in the evening of the fatal day that his wife had departed for the West, never to return; this story they also circulated throughout the neighborhood.

In convicting an absent principal, under the statute already quoted, of murder in the first degree, it is essential that the surrounding circumstances should weave about him a network of fact from which there is no possible escape. In my opinion the defendant, James D. Farmer, stands in that precise situation, and the judgment convicting him of murder in the first degree must be affirmed.

CULLEN, Ch. J., GRAY, VANN, WERNER and HISCOCK, JJ., concur with HAIGHT, J.; EDWARD T. BARTLETT, J., reads dissenting opinion.

Judgment of conviction reversed, etc.