### STATE v. OLE O. SOLEM.[1]

December 22, 1916.

Nos. 20,023—(11).

**Homicide — finding sustained by evidence.**

1. In a prosecution for homicide it is *held* that the evidence sustains the finding of the jury that the death of the deceased was caused by poison.

**Same — new trial granted.**

2. The evidence is insufficient to sustain the finding of the jury that the defendant administered the poison.

[1]Reported in 160 N. W. 491.

Defendant was indicted by the grand jury for the crime of murder in the first degree, tried in the district court for Jackson county before Quinn, J., and a jury which found defendant guilty as charged in the indictment. From the order denying his motion for a new trial, defendant appealed. Reversed.

*Wilson Borst* and *H. H. Hammer,* for appellant.

*Lyndon A. Smith,* Attorney General, *James E. Markham,* Assistant Attorney General, *E. H. Nicholas,* County Attorney, and *H. H. Dunn,* for respondent.

HOLT, J.

The defendant was convicted of murder in the first degree, and appeals from the order denying his motion for a new trial.

The only question necessary to discuss is whether the evidence sustains the verdict. This question involves an inquiry whether the death of deceased was caused by poison, and if so whether defendant administered it.

1. Sigri Haldorson died on December 5, 1914. The indictment alleges that the defendant administered poison to her on November 28, 1914, and that her death resulted from it.

The body of the deceased was exhumed on May 11, 1915, and portions of some of the internal organs were put in a tin container and sent to the university and an analysis was made. Because of the character of the container, the result of the analysis was subject to question. The body was again exhumed on February 23, 1916, on the eve of trial, and a second analysis was made by the same chemist. He claims that arsenic was found in poisonous quantities. At the instance of the defendant the body was exhumed on October 15, 1915, and portions of certain of the internal organs were taken and sent to a chemist in Minneapolis and an analysis was made. He claims that arsenic was not found in quantities indicating that death was caused by it. The state claims that symptoms, of which there was evidence, developing in Mrs. Haldorson on Saturday, November 28, 1914, or soon afterwards, and which the jury might have thought quite marked, were indicative of arsenical poisoning. There was no attending physician. Certain physicians, testifying from the results of the chemical analysis made and from the testimony as to the symptoms of the deceased and the history of the case as told at the trial, give it as

their opinion that death resulted from arsenical poisoning. Others reach a contrary conclusion.

A majority of the court are of the opinion that the question whether deceased came to her death from arsenical poisoning was for the jury, and that the evidence sustains its finding that she did.

2. For many years Sigri Haldorson and her husband, John Haldorson, resided in the northern part of Jackson county on an 80-acre farm. They had three daughters, one the wife of the defendant Solem, another the wife of Ole O. Engan who lived nearby, and the other, a married daughter, living in North Dakota. The defendant and his wife and family lived at Windom for many years. Mrs. Haldorson and her husband were old and infirm. In October, 1908, they deeded their farm to Severin Holman and Signi O. Holman in consideration of support for life. Mrs. Holman was the daughter of Mr. and Mrs. Engan. The Holmans were making preparations to move onto the farm and care for the old people. A few days after the execution of the deed and in the same month Mrs. Solem was out from Windom on a visit to her mother. She claims that her mother wanted her to stay and take care of herself and husband. In any event she did stay and took care of them until they died. The record discloses no serious objection on the part of the Holmans. Haldorson died in March, 1909. On January 13, 1911, Mrs. Haldorson devised all her property to Mrs. Solem. Soon afterwards Mrs. Haldorson commenced an action to set aside the deed given to the Holmans. An action of this nature was pending at the time of Mrs. Haldorson's death. Mrs. Solem was appointed administratrix and substituted as a party. At the time of her death Mrs. Haldorson was 78 or 79 years of age. She had been an invalid for 14 years and for six years had been bedridden and substantially so helpless as to require constant attention. There was hostility between the Solems and the Engans and the Holmans. The cause of it is referable to the 80-acre farm.

The state claims that on November 28, 1914, the defendant administered paris green to Mrs. Haldorson. On March 4, 1915, Mr. and Mrs. Solem were ejected from the farm at the suit of the Holmans. The sheriff executed the writ. He and his deputy testify that in going through a cupboard in the house they found in a corner of it a can of paris green from which a small quantity, perhaps two or three spoonfuls, had

been taken. They took it from the house, but left it on the place with other property of the Solems. The Solems stayed on the farm for some days or weeks after their ejection from the house, living in the granary. After the arrest of the defendant search was made for the paris green among the property with which it was left. It was not found. Witnesses for the defendant, who were at the house about the time of Mrs. Haldorson's death, both before and after, including Mrs. Solem, say that there was no paris green there or at least that they saw none. The defendant, when told that paris green had been found, denied that any was upon the premises. He said that they had no use for it as they had no garden.

Mr. and Mrs. Solem were the only persons about Mrs. Haldorson on November 28, 1914, or immediately prior thereto except as neighbors called. During the last week of her life Mrs. Haldorson ate practically nothing. Mr. and Mrs. Solem had the opportunity of administering poison to Mrs. Haldorson. Mrs. Solem denies any knowledge of poison, and her testimony is that her husband did not give Mrs. Haldorson food to her knowledge. The chemist testifying for the state claims that copper and arsenic were found by his analysis, and there is some suggestion that qualitatively they were in the proportions to be expected, if paris green were taken into the body.

At one time when the county officials mentioned paris green to the defendant, he said that if they would use their influence to get him out of jail on bail he could get the guilty party in 30 days; that he knew who the guilty party was; that he would not give any information while in jail; that he had made a little investigation of his own which he would not disclose; and that it would be used by him alone.

The evidence of a motive is not strong. Whether the title to the farm was in Mr. Haldorson at the time of his death or in Mrs. Haldorson is not shown. If in Mr. Haldorson, Mrs Haldorson had nothing but a life estate and no devisable interest. The Solems may have tired of the burden of keeping her, but, so far as appears, their care had been bestowed ungrudgingly and without complaint of its character.

Three or four witnesses gave character evidence in behalf of the defendant. He did not testify.

In a general way we have referred to all of the evidence which bears legitimately upon the question of the defendant's guilt.

It is the view of a majority of the court that the evidence is of so uncertain a character that a jury could not find by proof beyond a reasonable doubt that the defendant was guilty. A minority of the court are of the opinion that the evidence sustains the verdict.

In view of a new trial we call attention to certain evidence received without objection but which could not be received over objection. The county officials stated to the defendant when he was in jail that his little boy, about seven years of age at the time of his grandmother's death, had said to a neighbor boy just before she was taken sick on November 28, 1914, that she was going to die the next day for his father had given her potato poison. The ostensible purpose was to show an admission. None was made. The testimony was hearsay and obviously prejudicial. It was given over and over again in one form or another during the trial and was made a feature thereof. A foundation was laid for an argument to the jury that the defendant should have produced the boy by showing that he was at home at the time of the trial.

We call attention to another matter. On the cross-examination of some of the character witnesses, who testified briefly, the state, with the ostensible purpose of weakening their testimony, asked them whether they did not know that a Mrs. Bakken had lived at the home of the defendant; that she had died suddenly a few years before; that no doctor or undertaker was provided; that the defendant profited by her death to the extent of several hundred dollars; and that all this was the common talk of the community. This kind of interrogation was carried to great length, though without avail so far as weakening the testimony of the witnesses. The inquiry went so far as to suggest whether there had not been talk in the neighborhood about Haldorson dying suddenly on the farm in 1909 without an attending physician, and that no undertaker had been employed. No objection was made to it. The obvious effect of this testimony was to prejudice the defendant unfairly.

We think the state should not have given in evidence the purported remarks of the defendant's son, though no objection was made to them, and that it should not have carried the cross-examination of the character witnesses to the extent stated. It was all unfair to the defendant.

Order reversed.

BROWN, C. J.

To my mind the evidence made the question of defendant's guilt one of fact, and the verdict of guilty is sufficiently supported.

HALLAM, J.

I agree with the Chief Justice.