## STATE v. LYLE C. WADDELL.[1]

No. 29,080.

October 21, 1932.

[1]Reported in 245 N. W. 140.

*J. W. Schmitt, Charlotte Farrish, L. J. Lauerman,* and *Henry M. Gallagher,* for appellant.

*Henry N. Benson,* Attorney General, *Chester S. Wilson,* Assistant Attorney General, and *C. A. Johnson,* County Attorney, for the state.

STONE, J.

Convicted of first degree murder and sentenced to life imprisonment, defendant appeals from the judgment, his motion for a new trial having been first denied.

Defendant's alleged victim was one Floyd Williams, who came to his death by strychnine poisoning. Then a 12-year old ward of the state, defendant had taken him from the Minnesota State Public School at Owatonna, under contract with the board of control, August 27, 1925. Defendant agreed to receive him "into his family," to keep him until August 22, 1931, that is, until he arrived at the age of 18, "educating and treating him properly and kindly as a member of his family; to provide him with suitable and sufficient clothing for week days and for attending public religious

worship and with suitable food and other necessaries in health and sickness," to teach him a gainful occupation, "and the branches usually taught in the common schools." "At the termination of this indenture" defendant was bound to "furnish said child with two good suits of clothes" and to pay him $100 in cash.

Defendant then was and has continued occupant and tiller of an 80-acre farm near Mapleton in Blue Earth county. He owns ten acres adjoining, upon which there is a house occupied by the witness Mullin, to be referred to later. Defendant's mother has the life use of the 80 acres. He expects to succeed to title on her death and payment to two sisters of $1,500. In the meantime the annual rent is $240. Defendant is in comfortable circumstances, owning his live stock and farm equipment, and is out of debt except for current bills. He is 34 years old and happily married to a loyal wife some years his junior.

Floyd Williams died in defendant's home about 11:30 p. m. Friday, February 27, 1931. The cause was poison and the drug strychnine. The state charges defendant with having administered the drug, purposing death and to collect insurance under two life policies and one accident, each in the sum of $1,000, wherein Floyd Williams was the insured. The first life policy is in an old line company, issued November 27, 1929. In substance it was ordinary life insurance, the annual premium $12.81. The next contract was a benefit certificate of the Modern Woodmen of America, issued October 3, 1930. The accident policy followed, December 16, 1930. It carried a benefit of $1,000 for death of the insured "through violent, external and accidental means." Defendant was beneficiary in each policy. The jury was justified in concluding that it was defendant rather than deceased who was the effective, if not the sole, procuring cause of the issue of these policies. When the first policy issued the boy was 16, and when the last two were procured, 17 years old. There is evidence that he did not intend to remain with defendant after he was 18. Defendant himself had been an active and insured Woodman for years. He carried life insurance of $2,000 and accident insurance of $1,000, the beneficiary

his wife. Her life was insured for $2,000, he being beneficiary. He must have known of Floyd's right to change his beneficiary at will, and that if and when he should go elsewhere, he, defendant, would have little or no expectancy of remaining his beneficiary.

Defendant paid Floyd no wages. He does claim to have supplied him small amounts of money from time to time, the evidence as to amount not being at all definite. The aggregate could not have been large. Defendant paid the initial premium or assessment on Floyd's policies and those following, as far as necessary to keep the policies effective, as they were when the boy died.

There is testimony that in the forenoon of Thursday, February 26, 1931, just before defendant and his wife left to attend an auction, Mrs. Waddell, at defendant's suggestion, prepared a pitcher of lemonade; that a glass of it was taken by Mrs. Waddell and another by defendant before they left, the remainder being left for Floyd to drink with his own lunch. He was to remain alone on the farm. Just as the Waddells left, defendant returned to the house to get his rubbers. He was there alone long enough to poison the lemonade, as the state suggests he did. The Waddells did not return until early evening. The next day, Friday, the 27th, Floyd was not well, complaining somewhat and reclining on a lounge part of the time. That evening, after being out of the house for a few minutes, he returned, sat in a chair for a short time, did some reading, and about 9:30 went into a convulsion, the first of several which resulted in his death about two hours later. Such convulsions characterize strychnine poisoning. Together with post-mortem evidence, they put the cause of death beyond reasonable doubt.

At the onset of the convulsions, neighbor Mullin was summoned from his home across the road. Otherwise the Waddells and Floyd were alone until the arrival from Mapleton of Dr. Vezina, who was called by telephone. While he was treating Floyd and doing his best between convulsions to get such information from him as he could, it was learned that the boy had not taken anything intentionally, or, as far as he knew, accidentally, to explain his then critical condition. He did say that he had eaten a piece of candy

but not when or where. The statement the jury could well have concluded was made in the presence of defendant or speedily communicated to him. Another thing brought out at the time, as indicated by Mr. Mullin (who testified with such straightforward, honest, and apparent candor as to win the indorsement as to credibility of both state and defense) was a declaration by Floyd that he had been sick the day before; that he had tried the lemonade left for him and found it bitter; that during the afternoon, on the way to the house, he had fallen to the ground and "crawled" into the house and onto the lounge. Other facts will appear later.

■ It may be taken as a premise that a conviction of homicide cannot stand on evidence of motive alone. There must be other circumstances of such probative effect that, with motive, they prove guilt beyond reasonable doubt. State v. Singleton, 294 Mo. 346, 243 S. W. 147; People v. Holtz, 294 Ill. 143, 128 N. E. 341; People v. Cleminson, 250 Ill. 135, 95 N. E. 157 (chloroform—conviction sustained); People v. Farmer, 196 N. Y. 65, 89 N. E. 462; People v. Kuhn, 232 Mich. 310, 205 N. W. 188 (poisoning—conviction not sustained); State v. Brazzell, 168 Iowa, 480, 150 N. W. 683 (motive plus opportunity not enough); State v. Woodard, 132 Iowa, 675, 108 N. W. 753 (motive, insurance—conviction sustained); Ulrich v. Commonwealth, 181 Ky. 519, 205 S. W. 586 (paris green—conviction sustained); Davis v. State, 116 Neb. 90, 215 N. W. 785 (strychnine—conviction sustained); 30 C. J. 299.

■ Defendant himself testified at length. There was suggestion of accident or suicide. Of course it was not incumbent upon defendant to prove anything. The state's was the task to establish guilt beyond reasonable doubt. It was defendant, who, notwithstanding that Floyd had been a hard worker on the farm, for some time doing a man's work, intimated that he was after all in doubtful health, and possibly expecting need of the sanitarium benefits open to a Woodman afflicted with tuberculosis. That mere circumstance, possibly of no great weight, is yet a starting point for consideration of defendant's testimony.

196

He said unequivocally, shortly after the death and after it could have been taken that he knew that it was due to strychnine, that he found a partially consumed candy bar in the garage to which Floyd was accustomed to repair and where at the time he had some carpentry under way, and that defendant himself ate what remained. He first denied knowledge of Floyd's dying statement that he had eaten candy, but later admitted repeatedly that he knew of such statement when made. Mullin heard it; so did the doctor; and so did Mrs. Waddell. Yet on his own testimony he himself very soon consumed the only candy on the place. If guilty, destruction of evidence was natural, but it is highly improbable that he himself ate the candy. If innocent, it is incredible that he found the candy fragment and himself consumed it after what he had heard from the lips of the dying boy. If innocent, knowing Dr. Vezina's opinions as to the cause of death, why did he not carefully preserve the candy, report his discovery, and turn it over for analysis. If innocent, the suspicion that a member of his family had died from strychnine found somewhere in or about his home should have put defendant on strict guard against and search for the source in order that danger to others might be averted. Until the trial he professes to have resisted successfully belief that strychnine was the lethal agent. In the jury's view, he doubtless protested that point too much and too long. He was not ignorant at the time of Dr. Vezina's initial opinion or of its early confirmation by convincing post-mortem evidence. His asserted disbelief in the poison theory, and adherence to that of tetanus or suicide too long outlived any sensible basis there ever was for either. So anyway the jury may have reasoned.

Another rather strange thing is that, although defendant testifies to two acts of sodomy in which he claims to have apprehended the boy, he claims never to have mentioned them to anyone except his counsel and his wife until he took the witness stand. Floyd's death speedily came under investigation. Defendant and his wife were interrogated repeatedly and at length by county attorney, sheriff, and a representative of the state bureau of criminal appre-

hension. Defendant knew he was under suspicion. They asked him as to the boy's disposition, whether he was happy or otherwise, and specifically whether defendant had ever scolded him for anything. Defendant said he had severely but once, when the boy expressed desire or intention to shoot a neighbor's dog. That, according to defendant's then story, was the only thing which he could remember for which he had ever seriously taken the boy to task. The other two offenses were of such nature that, had they taken place as defendant testified, he could not have forgotten them. If innocent and honest, he must have mentioned them much sooner than he did. Anyway the jury was well within their province as weighers of evidence and triers of fact in so concluding.

Furthermore, the asserted offenses were of so revolting a nature that it is difficult to understand how he could have harbored the boy in his family longer than necessary. Yet, after their alleged discovery, we find him taking out and paying for more insurance on the offender.

Defendant's testimony concerning the insurance conflicts materially with that of the soliciting agents and also with itself and some reasonable inferences from undisputed facts. He denies ever having had talk with Floyd in which he, defendant, advocated insurance for the boy. He wants us to believe that Floyd was hesitant about taking insurance because of the cost to him, when it appears beyond dispute that defendant himself was intending to pay, and actually paying all premiums and assessments. Defendant denies "any particular discussion with Floyd about the merits or particulars of life insurance." He would have it believed that this unsophisticated youth displayed much knowledge about double indemnity and total disability provisions of accident insurance. He testified that it was Floyd, not himself, who first mentioned the matter of double indemnity. He emphasizes much his failure to understand a letter written Floyd on the question of defendant's becoming beneficiary in the Woodmen policy. The letter itself, in evidence, is just too plain to permit of misunderstanding. It is inferable also that defendant was very careful not to pay an assessment on one policy

until sure that absence of blood relationship between himself and Floyd would not prevent his being beneficiary. Assertion by and for defendant that Floyd was attracted by the social value of the local camp of Modern Woodmen is badly blunted as argument by the fact that one could become a social, as distinguished from an insured, member for nominal dues of 50 cents per month. Easily can it be thought that social benefits, sans insurance, were not the goal of whoever was the real procurer of the Modern Woodmen insurance.

To generalize and so avoid wearisome detail, if the jury concluded that defendant's attempt to explain his procuring Floyd's insurance, payable to himself, was the fabrication of a guilty man seeking to escape punishment, rather than the testimony of an innocent person truthfully relating facts as he remembered them, we can find no reasonable ground for disagreement. It is difficult to explain defendant's conduct on the hypothesis of innocence. That, together with other circumstances above referred to, the inherent disagreement in his own testimony, and the improbable nature of much of it, makes a foundation of proof sufficient to sustain the verdict. It is not for us to try the facts anew. It is not for us to say whether defendant is innocent or guilty. Our problem is only to ascertain whether, as matter of law, the record justifies the conclusion of the jury that defendant was guilty beyond reasonable doubt. We hold that it does.

Guilt appears, if at all, by circumstantial evidence. Hence conviction cannot be sustained if the circumstances can be reasonably explained on any theory other than that of guilt. Were we to select and take as true only the evidence favorable to defendant, the conclusion of guilt would be impossible. On and off the witness stand he stoutly maintained his innocence. But the record presents conflicts and problems of credibility which it was the jury's province to settle. They have done so, and the trial judge has not disapproved. We must therefore, on our part as reviewers on appeal, consider the record not from the standpoint of what we might think of it as an original matter, but of the estimate which

any trier of fact might put on it. The facts proved by direct evidence (death by poison and the insurance), plus the resolution against defendant of contradictions and improbabilities of testimony, particularly those inherent in that of himself, make a basis of fact which we cannot say is explainable on any hypothesis of innocence. There was no direct proof that defendant had, or had ever procured, strychnine from any source or that he administered the poison. All that weighs against the state but does not bar conviction. People v. Kuhn, 232 Mich. 310, 205 N. W. 188; People v. Gerndt, 244 Mich. 622, 222 N. W. 185.

Taken in all parts favorable to defendant, rejecting that which is unfavorable to him, all questions of credibility and contradiction resolved in his favor (as his counsel have argued the case), a contrary view would be compelled and defendant go free. But that approach is closed to us. We may not invade the jury's province nor usurp its functions. Reasonably, and with due regard to the presumption of innocence and the necessity of overcoming it by proof beyond a reasonable doubt, the jury could conclude, as plainly they did, that it was not possible to put the whole case in such aspect as to allow the answer "not guilty."

To sum the whole matter: If it was not murder, it was suicide or accident. Both are fairly negatived—self-murder particularly so. Homicide is then a legally tenable conclusion—and murder by poisoning is always accompanied by that degree of premeditation that puts it in the first degree. 13 R. C. L. 778. If it was murder, the whole evidence suggests none other than defendant as guilty. Guilt appears more strongly than in State v. Green, 153 Minn. 127, 189 N. W. 711 (grand larceny—conviction sustained); and it is far more evident than in State v. Solem, 135 Minn. 200, 160 N. W. 491 (poisoning—conviction of murder reversed).

■ Of the too numerous assignments of error, a large number are submitted without argument. Mere assertion of error ordinarily calls for no attention. In a civil case, where the property of a citizen rather than his liberty is at stake, we would ignore all assignments not supported by appropriate argument. But in view

of the nature of the case, we have winnowed the whole mass to ascertain whether, perchance, it may conceal some real grain of substance.

There is complaint because of the denial of defendant's motion for change of venue; because of the discharge of an entire jury panel and the drawing of a new venire from which were chosen the jurors who convicted defendant; and again because of alleged delay in arraignment. Enough to say that as to the first two it is plain that the learned trial judge did not abuse his discretion. It is particularly wide of the mark for defendant to complain of the discharge of the regular jury panel and the summoning of a new one. He had no right to be tried by particular jurors. His was not the right to select but only the right, within statutory limits, to reject. The delay of the trial was prolonged on motion of defendant himself.

■ On the indictment were indorsed the names of 23 witnesses. Defendant complains because the names of some few (how many is not made to appear) were not indorsed. So he assigns as error the denial of his motion to quash the indictment. There is nothing in the point. State v. Rickmier, 144 Minn. 32, 174 N. W. 529.

■ Equally futile is complaint that the minutes of the grand jury were defective in and that they name defendant by surname only and refer to the deceased as Floyd Waddell rather than Floyd Williams. Prejudice to defendant is not suggested and cannot rationally be imagined. The indictment itself named correctly both accused and his supposed victim. As to its substance otherwise there is no question. It was but waste of time and energy to move to quash. G. S. 1923, § 10648, as amended, 2 Mason, 1927, id. Its authenticity, and that is the important thing (State v. Ginsberg, 167 Minn. 25, 208 N. W. 177), is unquestioned.

Many errors are assigned as to the charge. None are of such a nature as to warrant much discussion. The issue was fairly and plainly presented to the jury in such manner that the rights of defendant could not have been jeopardized. In fact there was care properly to guard them. Repeatedly were the jurors told that

proof beyond reasonable doubt was prerequisite to a verdict of guilty. Reasonable doubt was explained in language not open to criticism. The jury were told that the reasonable doubt rule should not be used as a shield under which to escape performance of disagreeable duty. That was proper. There is complaint because it was repeated when the jury returned for further instructions, or rather a repetition of the charge, on the reasonable doubt rule. The judge then gave them nothing new but read from his charge only that portion which apparently the jury wanted.

■ The assignment of error which comes nearest to presenting something of merit goes to the closing argument of the county attorney, Mr. Johnson. Portions of it, separated from their context and weighed by the standards of pure . ethics, are open to criticism. Assisting the county attorney was an assistant attorney general. The jury was told in substance that the state "tells you" that defendant is guilty. Neither state nor any representative of it has the right in a criminal case to tell the jury any such thing, save in so far as the prosecution is able by analysis and summation of evidence to point out logically and reasonably how it tends to show guilt and bar reasonable doubt. But in this case, more than once the county attorney informed the jury, and of course the same warning was stressed by the judge, that they were the triers of fact; that theirs alone was the responsibility to weigh the evidence as they remembered it rather than as counsel recalled it; and in substance that they should be governed by the argument of counsel only as far as it agreed with the evidence and reasonable deductions therefrom. The jury were warned properly to weigh the arguments of counsel. It may have been unfortunate in this connection, and in any event is not to be approved, that they were charged that counsel were apt to "warp" the evidence. But here again the context was of such nature that the jury could not have been misled by defendant's prejudice.

The judgment is affirmed.

ON APPLICATION FOR REARGUMENT.

On November 18, 1932, the following opinion was filed:

PER CURIAM.

Defendant's petition for rehearing has been considered and is denied. But we take this opportunity to make plain what the opinion does not put in clear fashion. The state's theory was not that death resulted from the poison, if any, in the lemonade consumed by the deceased February 26. That incident is in evidence simply as a relevant preliminary circumstance. The claim was, and it prevailed, that the fatal dose of poison was in the candy, mentioned by the boy in his dying moments.

