STATE v. VIOLA GAVLE.[1]

May 18, 1951.

No. 35,443.

[1]Reported in 48 N. W. (2d) 44.

*Elmer R. Peterson* and *John F. D. Meighen,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Lowell J. Grady,* Assistant Attorney General, and *Rudolph Hanson,* County Attorney, for the State.

LORING, CHIEF JUSTICE.

May 9, 1950, the grand jury of Freeborn county, Minnesota, returned an indictment against Mrs. Viola Gavle, charging her with murder in the first degree. She was tried, convicted, and on June

24, 1950, sentenced to life imprisonment in the women's reformatory. She moved to have the verdict set aside and for a new trial. This motion was denied, and she has appealed from the denial of her motion and from the judgment of conviction.

Defendant is the mother of four children and the wife of Truman Gavle, a farmer, who lives in Freeborn county. She was tried for the murder of a Freeborn county farmer, Oscar Rasmussen. Rasmussen died of strychnine poisoning April 6, 1950. The strychnine found in his body was the form of that poison known as strychnine sulphate.

In support of the conviction, the state invites our attention to the evidence tending to prove that the events leading up to this tragic incident began sometime in April or early in May of 1948 when Truman Gavle, hereinafter referred to as Gavle, hired a laborer named Lawrence Nobles to work on his farm. While Nobles was employed on the Gavle farm, undue familiarity developed between him and defendant. Nobles testified that the affair progressed to the point of sexual relations before his employment on the Gavle farm had terminated. Defendant admits that the affair started as early as June 4, 1948, and that her husband discharged Nobles because he suspected Nobles was making advances to her, but she fixed the date when the first act of sexual intercourse occurred as being sometime in August 1948, after Nobles had been discharged. Nobles was discharged on or about July 11, 1948.

After Nobles left the employ of Gavle, he drifted from one job to another in the neighborhood, but defendant kept in touch with him by letter and telephone. Defendant admits this, but denies that the initiative was entirely hers. According to Nobles' testimony, meetings at the Gavle farm and elsewhere were arranged regularly, and defendant frequently went to Nobles' place of work to pick him up in the Gavle automobile. One of the letters which defendant wrote to Nobles tends to confirm the fact that arrangements to meet on given dates were made by letter. There was even a signal arrangement whereby defendant would leave a light burning in an upstairs

room so that Nobles would know when defendant's husband was gone for the evening. Nobles testified that he and defendant engaged in sexual intercourse about once a week during 1948 and 1949 and that this continued until sometime in February 1950.

While all this was going on, other plans proceeded apace. Nobles testified that sometime in the fall of 1948 defendant began to talk about divorcing her husband. Defendant admitted to Sheriff Carl Lindahl that she and her husband had talked of divorce, but did not say when such discussion or discussions had taken place. Later, at the trial, she denied that there had been any talk of divorce between her and her husband. Nobles also testified that in the fall of 1948 defendant told him that she had tried to poison her husband's coffee, but that it did not work. Nobles claims that at about the same time as defendant told of trying to poison her husband she mentioned that he had life insurance. Nobles said that because of the insurance defendant wanted to poison her husband rather than divorce him.

December 20, 1948, defendant sent a Christmas card and a letter to Nobles. The contents of the card and letter indicate that she and Nobles had already started saving money together. They called this the "jackpot," and defendant was apparently the treasurer of the fund. The letter and card abound with defendant's expressions of her love for Nobles. In the letter, she expressed concern over Nobles' giving her a "cold shoulder." Even if Nobles' testimony be ignored, defendant's conduct and correspondence up to April 4, 1950, show clearly and convincingly that her infatuation with him was complete. In one of her confessions, made soon after she was arrested, she admitted that she intended to marry Nobles after she got rid of Gavle. (See page 198, *infra*.)

Sometime in the summer of 1949, Nobles' affection for defendant appears to have waned, or, at least, his interest was temporarily diverted to another woman. Defendant objected to this association and finally dissuaded him from continuing it.

One evening early in October 1949, either on the second or the sixth of that month, defendant and Nobles drove to Albert Lea, Minnesota, together. While there, Nobles went into the North Side Drug Store and purchased a one-eighth-ounce bottle of strychnine. There is some disagreement in the testimony about the form of strychnine which Nobles purchased. The evidence bearing on this point is as follows: The druggist who sold Nobles the strychnine testified that he had no independent recollection of having sold strychnine to Nobles. However, his register indicated that on October 2, 1949, he had sold one-eighth of an ounce of strychnine to Nobles. The entry in the column of the register entitled "Intended Use" was marked "gophers." The form of strychnine sold was not stated on the register. The druggist testified that "alkaloid is preferred for gophers usually and strychnine for rats * * *." On direct examination and, at first, on cross-examination, Nobles testified that he asked for strychnine for rats. He testified that he had Truman Gavle in mind when he asked for rat poison. Later on in the cross-examination, he said that he asked for strychnine for gophers or rats. The druggist testified that strychnine sulphate is usually in coarse, granular, or crystal form and the alkaloid in powder form. After Nobles purchased the strychnine, he gave it to defendant. When she was asked whether the poison she had received from Nobles was in liquid form or in powder form, she answered, "Neither one, they were little crystals." From this, the jury was justified in concluding that the strychnine so purchased was sulphate—the kind that was found in Rasmussen's body.

In the latter part of November 1949, defendant told Nobles that she had put some of the strychnine in the dog food and that their dog had died. Defendant admitted having done this.

Sometime before December 17, 1949, defendant poured the contents of the bottle of strychnine into a partly filled bottle of whiskey and threw the empty strychnine bottle into the furnace. She hid the poisoned whiskey in a bedroom closet. There is some conflict in the testimony as to where defendant obtained the whiskey

which she mixed with the poison. In the statement which defendant made at the hospital on April 10, 1950, she said that she got the bottle of whiskey out of the family garage. Nobles testified that she got the bottle out of her husband's car. Later on, in her statement made at the jail on April 12, 1950, and when she was on the witness stand, defendant said that Nobles had given her the bottle of whiskey in which she mixed the poison.

The evidence discloses that the matter of poisoning defendant's husband was discussed between defendant and Nobles at various meetings up until December 17, 1949, and that it was not discussed thereafter. However, they continued to meet each other frequently until sometime in February 1950. During the Christmas season of 1949, defendant purchased an Elgin watch for Nobles. There is a conflict in the evidence as to whether the watch was a gift or whether defendant purchased it for Nobles with his money. March 15, 1950, was the last time defendant and Nobles saw each other before Rasmussen was poisoned.

During the day of April 4, 1950, defendant went to a pressure cooker clinic at Albert Lea, Minnesota. While she was in town that day, she mailed a letter to Nobles. The letter read as follows:

"April 4——

"I don't know where you are, or when this will reach you— but all I can do is hope the odds will turn in my favor once.

"I think I'm not lying when I say that I have done a lot for, you and I always meant it for the best. If ever I hurt you it hasn't been because I meant to. You have done a good job of hurting me, but I will not wish to sob on your shoulder. I just want to ask one favor of you so please come to see me just once more. I will not keep you long, and if I knew this letter was private I would write it all.

"I will give you the following dates hoping you will keep them. April 12 & 20th and of course we were supposed to have every other Sat. nite. I never have given up looking for you, but I guess I should know when the air is swung my way. I won't bother you

any more if you will come to see me once. In fact it's important.

"I haven't had any luck in locating you, but have heard lot's of your where-abouts. Certainly was a blow when you ditched me—Especially for such a damsel.

"If you can make it over any other time—It will suit me fine. And Remember I'm a friend who didn't ever fail you so if you ever feel I'm worth it—you'd better give me a thought once in awhile.

"I will be patiently waiting. Remember—I have no right to bawl you out and this letter wasn't meant as such. I could sure tell you lots of news, but imagine your happy where you are. Your happiness has sure been costly to my heart.

"P. S. I haven't seen *Bud* so if you do—tell him he can now take over where you left off. I'll never get over you till I find someone else—Of course don't get me wrong—It would hardly be Bud.

"Remember—April 12th (twelfth) or 20th—not to [*sic*] early. Sober as this is strictly business. I will meet you half way across if you give me a ring sometime.

"Please do this one favor for me. I've believed all you told me and if you could trust yourself like I trust you you'd be good.

"Am hoping to see you."

On the evening of April 4—the same day that defendant mailed the above-quoted letter to Nobles—she found an empty pint Corby whiskey bottle under the kitchen sink. She poured a small amount of the poisoned whiskey, which she had stored in the bedroom closet, into the empty Corby bottle. Having done this, she placed the Corby bottle under the front seat of her husband's car on the floor board on the driver's side, so that it was partly exposed and partly under the car seat. She emptied the whiskey bottle in which she had originally mixed the poison and threw the empty bottle into the junk yard north of the house on the Gavle farm. A pint whiskey bottle containing traces of strychnine sulphate sediment was later found in the junk yard.

On April 5, 1950, defendant carried on with her usual household affairs. Late in the morning of April 6, Oscar Rasmussen, Truman Gavle, and Albert Knutson chanced to meet in a tavern at Emmons, Minnesota. They had a couple of bottles of beer together at the tavern. While at the tavern, Gavle and Rasmussen decided to attend a street sale at Joice, Iowa, that afternoon. Gavle had to take his car back to the farm because defendant had mentioned that she wanted to drive it to a ladies aid meeting that afternoon. At Gavle's suggestion, Rasmussen and Knutson followed him home in Knutson's car so that they could take him back to Emmons that afternoon. When Gavle arrived home, he parked his car in the garage. Before leaving the garage, he reached under the front seat of his car and pulled out a partly filled bottle of whiskey, which he put in his pocket. He then went into the house and gave defendant some lye which he had purchased for her in town. Then, he got into the back seat of Knutson's car, and the three men drove away toward Emmons. Rasmussen rode in the front seat with Knutson.

When the men reached a point approximately two miles from the village of Emmons, Knutson stopped the car. Gavle took out the whiskey bottle which he had removed from under the seat of his car and handed it to the men in the front seat. Knutson noticed that there was not much whiskey in the bottle and said that he did not want any. Gavle told Knutson to go ahead, that he wanted to get rid of the bottle anyway. Knutson took a small sip from the bottle, then handed it to Rasmussen. Rasmussen tipped the bottle up, saying "Here goes," and drank what remained. He then threw the bottle out of the window on the right-hand side of the car.

When the three men arrived in Emmons, Knutson parked his car in front of the Knutson & Olien Hardware Store. By this time Rasmussen was not feeling well. Shortly thereafter, he went into convulsions and stiffened up, with his head pulled back.[2] A doc-

---

[2]Both Knutson and Rasmussen displayed these symptoms, which Dr. Martin O. Nesheim testified were characteristic in cases of strychnine

tor was called. Although he was only a block away at the time and responded immediately, Rasmussen was dying when he arrived at Knutson's car. He died shortly after the doctor's arrival. The doctor thought at the time that Rasmussen had suffered a heart attack.

Shortly after Rasmussen's death, Gavle abandoned his plan of going to the street sale and, instead, arranged to have a man take him home. When Gavle arrived at his home, he went directly to the davenport and lay down without telling defendant what had happened. Defendant, at the time, was preparing to leave for the ladies aid meeting.

Prior to Gavle's arrival at his home and even before the doctor arrived to care for Rasmussen, Knutson began to feel ill. He had gone into the hardware store to sit down. Dr. Nesheim noticed that Knutson was quite nervous and perspiring, but assumed that he was suffering the results of a nervous reaction from having seen Rasmussen die in his car. About 15 minutes later and after Dr. Nesheim had returned to his office, Knutson was extremely nervous and began to experience cramps and stiffness in his limbs. Dr. Nesheim was called back to attend him. The doctor asked if he had been drinking, but Knutson mentioned only that he had had a couple bottles of beer. Knutson was taken home, given a sedative, and put to bed. At 3 p. m., the doctor was recalled to care for Knutson, who was then suffering from convulsions. The doctor was called again at 4:30. On one of these later calls, Dr. Nesheim asked Knutson if he had had anything else to drink besides beer. Knutson then mentioned the whiskey for the first time.

_poisoning._ Knutson's reaction was, of course, milder. Knutson recalled that the whiskey which Gavle gave him had a bitter taste, and the whiskey found by Dr. Nesheim in the Corby bottle—which Mrs. Knutson picked up— also had a bitter taste. An autopsy performed on Rasmussen's body disclosed that a considerable amount of strychnine sulphate had entered his stomach and other parts of his body. Oscar Knutson recovered from his illness only after he was treated for strychnine poisoning. In light of all the above evidence, it is so clear that Rasmussen died of poisoning by strychnine sulphate that the matter is not debatable.

Dr. Nesheim arranged to have Knutson taken to the Naeve Hospital in Albert Lea at about 6 p. m. that evening. At the doctor's suggestion, they drove to Albert Lea by the same road that Knutson, Gavle, and Rasmussen had taken earlier in the afternoon. They stopped at a point in the road approximately two miles north of Emmons and, under Oscar Knutson's direction, made a search for the whiskey bottle which Rasmussen had thrown out the window. Mrs. Knutson found a pint Corby bottle along the roadside and handed it to Dr. Nesheim.

Upon arriving at the hospital, Dr. Nesheim poured the remaining contents of the whiskey bottle into a small vial. He put a small glass stick into the whiskey and drew it across his tongue. He experienced an intensely bitter taste which he recognized as belonging to a certain group of drugs called alkaloids. Dr. Nesheim treated Knutson for strychnine poisoning, and he recovered. The doctor immediately called Sheriff Lindahl of Freeborn county and, when the sheriff arrived, delivered the Corby bottle to him.

The following morning, April 7, the sheriff interviewed defendant and her husband at the sheriff's office in the courthouse at Albert Lea. The Gavles were questioned regarding the matter of Rasmussen's death. Although it appears that defendant was questioned rather informally and without going into much detail, defendant said that she did not know anything about the matter.

The evening of April 7 the Gavles were interviewed again at the sheriff's office. At that time, defendant denied that there had been any strychnine around the Gavle home, but told the sheriff that her husband had fired Nobles because of Nobles' drinking and because he suspected that Nobles had made advances to her. Saturday, April 8, the sheriff, the county attorney, and Mr. Bennyhoff, an agent of the Minnesota bureau of criminal apprehension, went to the Gavle home and interviewed Mr. Gavle again. They did not talk to or see defendant, who was ill and confined to her bedroom at the time.

Defendant's illness continued, and on Saturday morning she was suffering from nervous exhaustion, migraine headache, and

nausea. She was unable to sleep. On Sunday afternoon, April 9, defendant was taken to Naeve Hospital in Albert Lea. On Monday, April 10, defendant told her husband to have the sheriff come to see her. Early that afternoon, Sheriff Lindahl went to the hospital. His testimony describes the events which followed:

"I went to the office and asked what room Mrs. Gavle was in, and she told me, and I went down to the room and rapped on the door. She said, come in. I went in. She says, Mr. Lindahl, take me to jail, I did it, and I said, did what? I put the poison in the whiskey bottle and put it under Truman's seat. She says, can they hang me for it, and I says, no, they can't. Are you sure? I says, I am positive because they don't hang in Minnesota, and I went over to her and I said, I am sorry to hear it Mrs. Gavle but I don't believe you were alone. No, she says, Lawrence Nobles bought the strychnine at the North Side Drug Store."

After defendant made this confession, the sheriff called the county attorney, and that afternoon a written statement was taken from defendant. Thereafter, at defendant's request and with her doctor's permission, she was placed under arrest and confined in the county jail.

April 12, 1950, defendant amplified her original statement in a second statement taken while she was in the county jail. Some parts of the two statements have already been incorporated in the statement of facts, and other portions will be referred to as they become relevant. In general, the statements refer to defendant's relations with Nobles, to their plans and activities together, and to the purchase of the strychnine, which was mixed with whiskey and ultimately placed under the front seat of the Gavle car.

Although there are 22 assignments of error in this case, defendant's contention generally is (1) that the state has not presented sufficient evidence to prove either that she had a premeditated design to kill her husband; or (2) that the strychnine poison which Nobles purchased at the drugstore was the poison which killed Oscar Rasmussen. She contends that her conviction and

sentence were brought about by (3) improper instructions given by the trial court on the subject of premeditation; (4) failure of the court to instruct that the jury might find defendant guilty of a lesser degree of homicide; (5) improper remarks made by the county attorney in his closing argument; (6) remote and prejudicial evidence which was received at the trial; and (7) pressure upon the jury to return a unanimous verdict in order to escape the physical discomforts of the jury room. Defendant further contends (8) that the merit in some of her objections is confirmed by the fact that the jury, through its foreman, made an oral recommendation of leniency when it returned a written verdict of guilty.

Defendant is charged with the crime of murder in the first degree. That crime is defined in M. S. A. 619.07 as follows:

"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when perpetrated with a premeditated design to effect the death of the person killed or of another, * * *."

Defendant concedes that if it has been proved that she had a premeditated design to effect the death of her husband and that Oscar Rasmussen was accidentally killed as a result of acts done in execution of that premeditated design then she was properly convicted of first degree murder as defined in § 619.07. Her principal contention is that at the time Rasmussen was killed she had no design, premeditated or otherwise, to kill her husband, Truman Gavle.

■ Premeditation, being a process of the mind, and a design, likewise being a product of the mind, are wholly subjective and hence incapable of direct proof. They must be inferred from objective manifestations. It appears to us that the admitted[3] and undisputed facts in this case formed a sufficient basis for the jury, in its proper province, to infer that defendant perpetrated

[3]There is strong evidence to support the jury verdict in the following excerpts from the confession which defendant made on April 12, 1950:

"Q. Whose idea was it to poison Truman?

"A. Well, Lawrence suggested the use of the poison and I agreed. * * *

the death of Oscar Rasmussen with a premeditated design to effect the death of her husband, Truman Gavle.

"Q. Were you with Lawrence the night that the poison was purchased?

"A. Yes, I was.

\* \* \* \* \*

"Q. Will you go ahead and explain what occurred at this time?

"A. As I stated before, I picked him up at Twin Lakes and we went to Albert Lea. Lawrence suggested that we buy the strychnine tonight. I drove him to the North Side Drug Store and he went in and bought the strychnine \* \* \*.

\* \* \* \* \*

"Q. What did Lawrence Nobles do with the strychnine that he purchased at the North Side Drug Store?

"A. He gave it to me.

"Q. How do you know that the substance he gave you was strychnine?

"A. Well, I think that the bottle had the word strychnine on it and I'm sure that it had the word poison. The bottle contained crystals of a white and yellowish color.

"Q. What did you do with this bottle?

"A. I put it up in the closet of my bedroom on a shelf. About a month later Lawrence came to my house and gave me a pint bottle which contained about an inch and a half of whiskey. \* \* \* He told me to put the strychnine in the whiskey and to be careful that no one else got it and to give it to Truman when I had a chance.

\* \* \* \* \*

"Q. Was there any discussion at these meetings between you and Lawrence Nobles concerning administering the poisoned whiskey to your husband Truman?

"A. Well, he said that he knew Truman had been drinking and he asked me why I hadn't given it to him and I said I just hadn't been able to make myself do it.

\* \* \* \* \*

"Q. Did you fully expect to marry Lawrence Nobles after getting rid of your husband?

"A. That was the general idea, \* \* \*.

\* \* \* \* \*

"Q. Can you explain what contact you had with Lawrence Nobles since Christmas, 1949?

"A. I have contacted Lawrence by mail and phone and I also met him at the Milton Stephen farm with my car and on some occasions he has come out to our farm home.

The letter written by defendant on the day she placed the poisoned whiskey in her husband's car is documentary evidence from which the jury might have inferred that defendant, at that time, was still deeply in love with Nobles and much distressed at the thought of losing him. Truman Gavle's life was insured by two policies, and defendant admits knowing about one of them.[4] Defendant admits that she and Nobles discussed ways and means of poisoning her husband. Poison purchased for that purpose

\* \* \* \* \*

"Q. Will you explain what you did with the poisoned whiskey that you had hidden in your bedroom closet?

"A. On the night of April 4th, 1950 I took a Corby's pint bottle out from under the sink and poured the poisoned mixture into it. I went out and put it under the front seat of Truman's car.

"Q. Why did you use the Corby's bottle?

"A. Because I figured he maybe bought that kind of whiskey.

"Q. Why did you put it under the front seat of the car?

"A. Well, I didn't put it directly under the front seat of his car. It was out so that it should have been in sight.

"Q. Did you have a previous knowledge that Truman usually kept his whiskey under the front seat of his car?

"A. Well, to a certain extent I did.

\* \* \* \* \*

"Q. As far as you knew you intended this poisoned whiskey for your husband Truman and no one else?

"A. Yes.

\* \* \* \* \*

"Q. Mrs. Gavle, is there any additional statement that you would care to make at this time?

"A. I can only say that I don't know how I could ever have done such a thing. I am truly sorry from the bottom of my heart but of course that doesn't help now."

[4]It should be noted that although there was evidence from which the jury might have found an insurance money motive for attempting to kill defendant's husband, the basis for such an inference is undercut considerably by (1) the fact that neither defendant nor Nobles appears to have had a very specific understanding as to the amount or provisions of Truman Gavle's insurance policies; (2) the fact that defendant did not even bother to sign papers that would have given her a joint interest in her husband's bank account.

was used by defendant to kill a dog. The poison which killed Rasmussen was mixed with whiskey, a beverage to which defendant's husband was notoriously addicted. The poisoned whiskey was placed in his car in the place where he customarily kept his whiskey.

In the light of all the evidence, the jury was justified in wholly disbelieving defendant's story that she placed the poisoned whiskey in her husband's car to sicken him of whiskey and that she had no intention of killing him. Defendant testified that she did not expect him to drink the poison because of the bitter taste. She professed ignorance of the poison's lethal effect, but such ignorance is negatived (1) by the fact that she claims to have kept the poison for suicide purposes; (2) by the fact that she used the poison on a dog and killed it; (3) by the fact that she recalled seeing the word "poison" written on the bottle of strychnine; and (4) by the admitted fact that she and Nobles discussed the idea of poisoning her husband as a means of eliminating him.

Defendant testified that she thought the poison was all in the sediment at the bottom of the bottle, so that the part she poured off into the Corby bottle would just have a nasty taste. Nevertheless, if the evidence as a whole indicated a design to kill, the jury might well have inferred that defendant refrained from pouring any of the sediment into the Corby bottle because it might have served as a warning to put her husband on his guard. The jury also might have inferred that defendant poured only a small amount of the poisoned whiskey into the Corby bottle in the hope that her husband would toss all of it down in one gulp, as Rasmussen did, or, possibly, in the hope that he would not share it with others.

It was for the jury to judge the credibility of witnesses, to find the facts, and draw inferences in light of all the evidence. On appeal, even in a criminal case, this court is not required to test the propriety of the jury's finding by resolving all questions of credibility and drawing all inferences in defendant's favor.[5] If a jury,

[5]State v. Waddell, 187 Minn. 191, 245 N. W. 140.

acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proved guilty of the offense charged, we should not disturb its verdict.[6]

■ With respect to the state's proof directed at showing that the liquid which Rasmussen drank was the liquid which defendant placed in her husband's car, we think that the evidence on this matter is sufficient to take it out of the realm of speculation, in which defendant claims it was left. The principal conflict in the evidence on this point is the fact that Rasmussen obviously died from drinking strychnine sulphate,[7] and the druggist's register indicates that Nobles purchased strychnine for gophers, which normally would be strychnine alkaloid. But all the other evidence indicates that the strychnine which Rasmussen drank was the strychnine that Nobles purchased. It is particularly significant that the bottle in which defendant originally mixed the poison contained traces of strychnine sulphate and that the strychnine which defendant received from Nobles was in crystal form, the usual form of strychnine sulphate.

In State v. Waddell, 187 Minn. 191, 245 N. W. 140, defendant was convicted of poisoning his ward, though no direct evidence whatever was introduced to prove that he had either procured or administered the poison. By the testimony of Nobles and Gavle and by defendant's own admissions, the path of the poison, from the time of purchase to the time that Rasmussen drank it, is traced in unbroken sequence. The Corby bottle, from which Rasmussen drank and which he threw out the car window, was found by Mrs. Knutson at the place where it had been thrown by Rasmussen. That it was the same bottle into which defendant had put the poisoned whiskey is satisfactorily proved by the sediment of strychnine sulphate found in it.

■ However satisfied we may be as to the sufficiency of the evidence to support defendant's conviction, we are yet obliged to

[6]See, footnote 5, *supra.*

[7]See, footnote 2, *supra.*

consider whether defendant is correct in her contention that errors were committed in her trial.

Defendant's first contention in this respect is that the trial court erred when it instructed the jury that—

"It is a fairly well established rule in the law that *murder by poisoning is always accompanied by that degree of premeditation that puts it in the first degree; * * *.*" (Italics supplied.)

This instruction was clearly correct. The portion of the instruction which is italicized in the above quotation is in the exact words of our opinion in State v. Waddell, 187 Minn. 191, 199, 245 N. W. 140, 143. The rule announced in the Waddell case and stated in the trial court's instruction in the case at bar is generally in accord with the law elsewhere.[8] It is difficult to compare the case law of other states with our own because of differences in the criminal codes of the various states; but, so far as we can determine, the practice of implying malice, premeditation, or their equivalent in cases of intentional poisoning is the rule rather than the exception. This is apparently a rule of long standing, for in Blackstone's day he reported that (IV Blackstone's Commentaries, 200)—

"in many cases where no malice is expressed, the law will imply it: as, where a man *wilfully* poisons another, in such a deliberate act the law *presumes malice,* though no particular emnity can be proved." (Italics supplied.)

The earliest statutory provision declaring wilful poisoning to be a crime in England appears to have been enacted in 1530 (22 Hen. VIII, c. 9 [IV Stat. at Large, p. 205]):

"*Wilful* poisoning shall be adjudged high-treason, and the offender therein shall be boiled to death." (Italics supplied.)

---

[8]"* * * Where death is effected by poisoning the crime is first degree murder,[4] the statutes in many instances expressly so declaring.[5]" 13 R. C. L., Homicide, § 84.

"* * * Where death is effected by * * * poisoning, the crime is ordinarily first-degree murder,[15] * * *." 26 Am. Jur., Homicide, § 15.

Cases are cited where footnotes are indicated.

In 1547, by the provisions of 1 Edw. VI, c. 12, § 13 (V Stat. at Large, p. 265), it was enacted:

"* * * That all *wilful* killing by poisoning of any person or persons, that at any time hereafter shall be done, perpetrated or committed, shall be adjudged, taken and deemed wilful murder of *malice* prepensed; * * *." (Italics supplied.)

It will be noted that the rule, as stated by Blackstone and in both English statutes, required a wilful killing, and so far as we can determine it has never been held that an accidental death resulting from the administration of poison was murder if the poison was given for an innocent purpose. Some states, however, have extended the doctrine of implied malice to considerable length. It has been held that, even though a killing is accidental, malice is nevertheless inferred when the poison is given for the purpose of perpetrating a felony[9] or accomplishing some unlawful purpose.[10]

In Wharton, Homicide (3 ed.) § 97, pp. 122-123, the rather sweeping statement is made that—

"Where poison is administered unlawfully and without a good intention, and death ensues, the law infers or presumes that the killing was intentional and voluntary and with malice aforethought.[1]" (The following cases are cited where footnote 1 is indicated: State v. Wells, 61 Iowa 629, 17 N. W. 90, 47 Am. R. 822; Johnson v. State, 92 Ga. 36, 17 S. E. 974; State v. Baldwin, 36 Kan. 1, 12 P. 318; State v. Wagner, 78 Mo. 644, 47 Am. R. 131; Sellick's Case, 1 N. Y. City Hall Rec. 185; State v. Town, Wright [Ohio] 75; Rupe v. State, 42 Tex. Cr. 477, 61 S. W. 929.)

Because our statute defining murder in the first degree requires that the killing be "perpetrated with a * * * design to effect the death of the person killed or of another,"[11] we think that in

---

[9]Rupe v. State, 42 Tex. Cr. 477, 61 S. W. 929.

[10]State v. Wagner, 78 Mo. 644, 47 Am. R. 131.

[11]M. S. A. 619.07.

this state the poison must be administered with an intent to kill in order to make the offense murder in the first degree.[12] In this respect, we are entirely in accord with defendant's contention that first degree murder cannot be presumed from the mere fact that poison was the cause of death. We nevertheless adhere to the rule announced in State v. Waddell, 187 Minn. 191, 245 N. W. 140, to the effect that if it is proved that poison is administered for the purpose and with the intention of effecting the death of another human being, it will be presumed that the killing was a premeditated act so as to make the offense murder in the first degree.

Defendant's position, as we understand it, is not so much that the trial court erred in giving the instruction that murder by poison is presumed to have been premeditated as it is that the court should have defined the word "murder" so that the jury could fully understand the instruction given.[13] Defendant contends that the jury was led to believe that it should find her guilty of murder in the first degree, even though she might have placed the poison in her husband's car for a purely innocent and well-intentioned purpose. In light of the court's entire instruction, we think that defendant's position is untenable. The court, in giving its instructions to the jury, read the indictment against defendant. The indictment expressly accused defendant of administering strychnine to Oscar Rasmussen "with intent then and there to kill Truman Gavle." The jury was instructed that it was to say whether that accusation was or was not true.

The trial court defined the words "premeditated" and "design" in some detail and distinguished between the two. The court pointed out that a design is a purpose or intent to do some particular act and that in the case before them the design must be to effect the death of the person killed or another. The court defined

---

[12]See State v. Cantrell, 220 Minn. 13, 18 N. W. (2d) 681, for a case where a death resulting from a negligent handling of poison was held to be second degree manslaughter.

[13]Since all crimes in this state are statutory, it is, of course, impossible to define the word "murder" without reference to the various degrees. The court twice gave the statutory definition of murder in the first degree.

"premeditation" as a process of thinking of or meditating upon that design preparatory to executing it. When the court instructed the jury that murder by poisoning is always accompanied by "premeditation," it was left for the jury to say whether the poison was administered with a design to effect the death of the person killed or another.

Early in its charge the court instructed that—

"the law requires   *   *   *   that the killing shall have been *willful* and deliberate and premeditated, * * *." (Italics supplied.)

The idea of a wilful killing, even to the lay mind, would appear to be wholly inconsistent with the idea of a death occurring accidentally through the use of poison administered for an innocent purpose.

Since the instruction which the trial court gave relative to murder by poisoning was entirely correct and since there is no reason to believe that the jury failed to comprehend the instruction, we find no reversible error with respect to that portion of the trial court's charge.

■ Defendant has also assigned as error the court's action in submitting the issue of murder in the first degree to the jury. We have already indicated that there was sufficient evidence to submit that issue to the jury. Defendant is not in a position to assert that the court erred in submitting that sole issue rather than instructing the jury that they might instead find that defendant was guilty of a lesser degree of homicide. Defendant submitted a request asking that the trial court instruct the jury "that the only permissible verdicts are guilty of the crime of murder in the first degree, as charged, or not guilty." This request was apparently submitted pursuant to the advice contained in State v. Morris, 149 Minn. 41, 45, 182 N. W. 721, 723:

"* * * If, * * * the accused desires to relinquish his chance of escaping with a conviction of a lesser offense in the hope that the jury will refuse to convict him of a greater, he should request the court to instruct that the only permissible verdicts are guilty as charged or not guilty, * * *."

■ Defendant's next contention is that the county attorney, in his closing argument, made an unfounded assertion of a material fact when he made the statement that "When you use poison, you use poison to kill." Defendant further objects to the county attorney's statement that "Any grown person would be put on notice that any amount of strychnine would be a fatal dose." Although these statements, taken out of context, sound prejudicial, we think that in their context these remarks were not misleading, unethical, or even unfair. Throughout her trial, defendant claimed that she did not intend to kill her husband, but only to "sicken his liking for whiskey," and that she did not know the poison was lethal. The county attorney's statement that "When you use poison, you use poison to kill" was made in connection with a long discussion of evidence directed at showing that this defendant had used poison with intent to kill. Defendant was asking the jury to infer that when you use poison you use it to sicken people of whiskey. It may be reasonably inferred that the county attorney, by his remark, merely suggested that a different inference be drawn. No doubt the jury so understood it.

So far as his remark about the amount of strychnine which would be a fatal dose is concerned, the county attorney preceded that remark with a rather detailed discussion as to the amount of strychnine which would be a fatal dose. He pointed out that the bottle of strychnine which defendant poured into the original whiskey bottle was sufficient to kill approximately 33 adult persons and that a quantity approximately equal to a third of an aspirin would be a fatal dose. In light of these preliminary remarks and in light of rather detailed evidence that strychnine is used in extremely small amounts for medicinal purposes, we think that the jury could not have been misled and that the county attorney's remarks could have been understood in no other sense than that any grown person would be put on notice that any *appreciable* amount of strychnine would be a fatal dose. Defendant professed to be ignorant of the lethal effects of strychnine, and we think it was entirely proper for the county attorney to suggest that she could not have been so

ignorant. It must be remembered that she had killed her dog with strychnine from this very bottle and that she testified she was keeping it for the purpose of committing suicide, if so inclined.

■ The next assignment of error to be considered presents the problem of whether the trial court erred in admitting evidence of defendant's love affairs with Nobles. It is defendant's contention (1) that the state failed to establish any connection between this affair and the alleged offense charged in the indictment, so that this evidence was wholly irrelevant; (2) that the love affair had terminated long before defendant placed the poisoned whiskey in her husband's car, that evidence of this affair would, in the mind of the average juror, tend to justify a verdict of guilty, irrespective of the charge in the indictment, and, hence, that this evidence was at least remote and prejudicial.

We are not unmindful that, as a general rule, evidence against the accused should be confined to the specific offense charged and that no evidence should be received as to his commission of other independent and disconnected acts, whether criminal or merely meretricious.[14] However, an exception to this rule permits evidence of other unrelated crimes committed by the accused to be introduced if such evidence shows a motive for the commission of the crime charged.[15]

It was fully as competent for the prosecution in the present case to prove that defendant murdered for love as it was for the prosecution in State v. Waddell, 187 Minn. 191, 245 N. W. 140, to prove that the defendant murdered for money. We think that

---

[14]State v. Friend, 151 Minn. 138, 186 N. W. 241; State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315.

[15]State v. Lawlor, 28 Minn. 216, 9 N. W. 698; see, State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227, 73 A. L. R. 380; State v. Voss, 192 Minn. 127, 129, 255 N. W. 843, 844. See, also, 2 Dunnell, Dig. & Supp. § 2459; 20 Am. Jur., Evidence, § 313; Underhill, Criminal Evidence (4 ed.) § 184. In the Lawlor case, evidence showing that defendant was the paramour of a woman who was insulted by the deceased was admitted to show motive.

the evidence of defendant's relations with Nobles was relevant to the issue of motive.

Although evidence relevant to the offense charged may incidental-between defendant and Nobles had terminated long before the death of Oscar Rasmussen, the letter which defendant wrote to Nobles and mailed on April 4, 1950, is compelling evidence to the contrary. Contrary to defendant's contention, we think that evidence of defendant's love affair was neither remote in point of time nor irrelevant with respect to its bearing on the issue of motive.

Although evidence relevant to the offense charged may incidentally tend to show the commission of other crimes, such evidence is nevertheless admissible. State v. Jansen, 207 Minn. 250, 290 N. W. 557; State v. Priebe, 221 Minn. 318, 22 N. W. (2d) 1. As one Kansas court stated (State v. Adams, 20 Kan. 311, 319):

"* * * it is * * * clear, that whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. * * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."

It is sometimes a close question whether the probative value of such evidence is outweighed by the risk that its admission will necessitate undue consumption of time, confuse the issues, surprise the defendant, or mislead and unduly prejudice the jury; but where, as here, evidence of other crimes is admissible under an exception to the general rule, the admission of such evidence is within the discretion of the trial court, and this court will not interfere except in cases of abuse of such discretion. State v. Voss, 192 Minn. 127, 255 N. W. 843; State v. Duffy, 179 Minn. 439, 229 N. W. 558; see, State v. Haney, 219 Minn. 518, 520, 18 N. W. (2d) 315, 316. We find no abuse of discretion here.

■ The principal issue remaining is whether the trial court erred in refusing to grant a new trial on the ground that physical discomforts suffered by the jury forced at least one juror to accede to a verdict of guilty in order to escape such discomforts. Defend-

ant made a motion for a new trial on the grounds stated and in support of the motion submitted an affidavit of a 66-year-old male juror stating that he had voted for a verdict of .guilty because he could hold out no longer. In this case there was a mixed jury, and, contrary to the provisions of M. S. A. 631.09, no separate ac-commodations were provided for the women jurors. The jury deliberated for 17 hours and 25 minutes before returning a verdict of guilty. The affiant juror stated that it was hot .and close in the jury room, that the chairs were hard, and that, although a bailiff provided an electric fan to improve conditions in the jury room, he would not permit the affiant juror to go into the adjoining courtroom to lie down. Affiant claims to have been ill for four days after getting out of the jury room, and he further stated that one woman juror had an attack of illness during the jury deliberations.

Although this court does not condone the practice of failing to provide a mixed jury with the separate accommodations required by statute where such accommodations are necessary, and although we should not allow anyone to be convicted by a verdict returned under coercion, we are nevertheless hesitant to allow jurors to impeach their verdict. We are even more hesitant to allow one juror alone to impeach the verdict of the remaining eleven. The rationale of the rule that jurors should not be allowed to impeach their verdict is well stated in Perry v. Bailey, 12 Kan. 539, 545:

"* * * Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to induce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict."

The Perry case states an exception to the general rule against allowing jurors to impeach their verdict. That exception applies

to cases where some of the jurors, by overt acts, have coerced other members of the jury. The Perry case holds that affidavits showing such coercion may be used to impeach the verdict, because proof of the coercive overt acts does not lie exclusively in the consciousness of one juror. Presumably, if overt acts can be proved to show coercion, then physical conditions of the jury room and other circumstances affecting the comfort of the jury are equally susceptible of objective proof. This exception was referred to in Wester v. Hedberg, 68 Minn. 434, 435, 71 N. W. 616, 617, but no decision with reference to its merit was made.

In State v. Hook, 176 Minn. 604, 224 N. W. 144, an affidavit of a woman juror was offered to show that she had been ill on the day the verdict was rendered; that, because of the inconvenience and lack of separate accommodations for the women jurors, she finally was forced to vote a verdict of guilty, as she could no longer stand being confined in the jury room without proper accommodations. In that case the jury deliberated 23½ hours. There, it was argued that facts which obviously coerced the juror might be shown. In answering this contention, the court stated (176 Minn. 608, 224 N. W. 146) :

"In this state it is settled that a juror may not impeach the verdict he took part in rendering. [Citing cases.] * * * if facts like those appearing from the affidavit of the juror in question are accepted as showing a coerced verdict, a practice is approved which imperils nearly every verdict. A juror may thus after the verdict has been rendered think of some physical or mental discomfort, of which neither court nor fellow jurors were apprised, which moved him to consent to the verdict against his better judgment, and by so disclosing to the defeated party the latter could obtain a new trial. We consider such procedure intolerable. We see nothing in facts disclosed indicating a coerced verdict, or that the court violated any statute to defendant's prejudice."

We interpret the Hook case as holding that the lack of statutory accommodations for women jurors is not sufficient to show coer-

cion, and we have found no case which holds that hot weather, hard chairs, long hours, weariness, or the age of jurors demonstrate sufficient coercion to impeach a verdict. We have come a long way since the days when jurors were held without food and drink or even hauled by oxcart around the circuit with the judge until they could reach a verdict; but we think the day has not yet come when verdicts may be impeached by a showing of hardships and discomforts which are no greater than men and women frequently experience in their everyday affairs. In this particular case, the jury was twice polled and twice affirmed its verdict in open court. The verdict must stand.

■ Defendant's last contention is that some infirmity in the verdict is indicated by the fact that the jury, through its foreman, made an oral recommendation of leniency in connection with its written verdict of guilty. In our opinion, there is no merit in this contention. In Robyn v. White, 153 Minn. 76, 189 N. W. 577, the jury returned a verdict for plaintiff with a recommendation that the money be given to the Red Cross. There the court stated (153 Minn. 79, 189 N. W. 578) :

"* * * we think the better rule is that when there is a verdict clear and sufficient in all respects, such foreign and irrelevant matter may be rejected as harmless surplusage. *It is much the same in principle as a recommendation of clemency. This has never been held to vitiate a verdict.*" (Italics supplied.)

This appears to be practically the universal rule. See, Annotations, 17 A. L. R. 1117, at p. 1156, and 87 A. L. R. 1362, at p. 1370.

The order and judgment are affirmed, and the sentence pronounced is hereby ordered executed.