### In the Matter of the WELFARE OF T.J.M., Child.

### No. C7-87-424.

Court of Appeals of Minnesota.

Oct. 6, 1987.

W.M. Gustafson, Nicollet Co. Atty., Michael R. Riley, Asst. Co. Atty., St. Peter, for petitioner.

James W. Brandt, St. Peter, for respondent.

Mark Halverson, Mankato, for Child.

Considered and decided by CRIPPEN, P.J., and LESLIE and LOMMEN,* JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

Appellant contends the trial court erred in its choice to place her 13–year old child in an out-of-state residential facility located at least 170 miles from the family home. She also appeals the decision to delegate visitation decisions to the facility staff. Finally, she claims the court erred in refusing to permit testimony of a doctor who had examined the child. Except as to the visitation issue, we affirm.

## FACTS

In a petition filed in October 1985, a sheriff's investigator alleged that Tammie M. was a dependent child, having need for special care that appellant, her mother, was unable to provide.[1] The child, born on November 19, 1973, was 11 years old when the petition was filed.

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

1. The statutory definition of a dependent child includes one

[w]ho is in need of special care and treatment required by a physical or mental condition and whose parent, guardian, or other custodian is unable to provide it.

Minn.Stat. § 260.015, subd. 6(b) (1986).

### a. Adjudication

On December 27, 1985, the trial court adjudicated that Tammie M. was dependent as alleged in the petition. The court cited events on September 15 and October 9, 1985, when conflict between the child and her mother led to police intervention and removal of the child from the home. The court found that appellant and the child needed professional help, and that it was predictable there would be continued conflicts where appellant would not be able to deal with Tammie's emotional outbursts. There was a real possibility, the court found, that Tammie might injure someone during these conflicts.

Tammie was adopted by appellant in 1982. Appellant had furnished foster care for the child during much of 1980 and 1981. The record shows that Tammie had low-average intellectual ability and she had been developmentally delayed in the early years of her life. She had suffered a poor relationship with her biological mother. Among the disturbing circumstances encountered by the child in the home of her natural mother was an episode where she was forced to watch adult sexual activity. A psychologist reported to the court in December 1985 that the child had made tremendous developmental strides since being adopted.

Beginning in July 1985, episodes of conflict regularly arose in appellant's relationship with the child. On these occasions, the child became very agitated, quickly alternating between attacking her mother, verbally and physically, and remorseful crying. On September 15, 1985, after police had arrived at the family home, Tammie's outburst included grabbing a knife from a kitchen drawer, pointing it at her mother, and then putting down the knife and crying. The trial court found that the child had "pulled a knife" on one other earlier occasion. The evidence showed that the child performed well in school, had affection for her mother, worked through most peer relationship problems, had no thought disorders, and had no behavioral problems other than in the periodic conflicts with her mother. Evaluation reports to the court indicated that the child's impulsive actions had to do with her stage of maturity, her fears of rejection by her mother, and her inability to think through "ambiguous" social problems.

In its adjudication order, the trial court found that appellant "must be willing at this point to put her own ideas aside and attempt to implement the ideas of third parties who have the necessary training and experience to deal with these types of problems, and who can view the situation in an objective manner." Evidence showed that appellant was knowledgeable about child development. The record shows that appellant insistently took a rigid approach to the child's misconduct, and during 1986, she refused counseling services that the court and a social worker thought were important.

### b. Initial disposition

Between October 15 and late December 1985, Tammie was in shelter care at a foster home near St. Peter, where her mother lived. In the first half of 1986, the child was at home under protective supervision of the county welfare agency. The next report of problems occurred in June 1986, when appellant reported several small thefts of her money by the child, including one incident where Tammie forged her mother's name on a $10 check. On June 14, due to the check incident, Tammie was returned to shelter care. No delinquency petition was filed, but the dependency disposition was reviewed at a hearing on July 15.

### c. Placement

After the case was reviewed by the trial court in July 1986, custody of the child was transferred to the Nicollet County Welfare Board. The court ordered a foster home placement near St. Peter, and ordered that any other placement was at the discretion of the agency if a nearby foster placement was not available. The court found that appellant would not allow Tammie to return home until the child had "taken action regarding her dishonest behavior."

The trial court found that appellant "appears to lack certain parenting skills," and that the child's only problem was a need

for help in "socialization." The court noted that placement some distance from St. Peter would threaten the goal to rehabilitate the parent and child, and might be the "beginning of the end of the parent-child relationship."

Despite the trial court's preference, the welfare agency later placed the child in a special service foster home at Lewiston, Minnesota, 100 miles from St. Peter. In September, the trial court considered ending the placement but decided that things would not work out at home because the child vacillated between favoring and opposing contacts with her mother.[2] This would create a risk of further instability because the child might move in and out of the home placement. The court rejected appellant's request to end the placement, and noted that appellant was second-guessing service proposals, requesting visits solely at her convenience, and imposing requirements on the child as conditions for her return home.

On October 16, the trial court suspended visitation contacts for 30 days, refusing appellant's request for numerous visitations. On November 4, using bus fare provided by her mother, Tammie left Lewiston and returned home. The Lewiston foster parents refused to give further service and the public welfare agency asked for a residential placement of the child.

### d. Residential placement

On November 20, noting the number of different foster homes the child had lived in since 1985, the court ordered that Tammie be placed in a residential facility, with visitation to "be as determined by the treatment facility." The court found that the placement might not help Tammie to live at home, but that a home placement with regular public services involved too much risk and would not meet the child's needs.

For most of the period between November 4, 1986 and January 27, 1987, Tammie was at home, attending school in St. Peter. On December 18 she was taken by police to St. Joseph's Home, Minneapolis, for a pre-placement evaluation. Appellant was denied visitation over the holiday period. Tammie walked away from the facility on January 6, and appellant picked her up in Minneapolis and took her home.

On January 27, the child became very upset. After her mother left her alone, the child finally called her social worker. She was placed in a foster home overnight, but was hospitalized the next day when she remained very agitated and talked of suicide and of running. On February 2 the court conducted another hearing[3] and ordered a placement at Eau Claire Academy, to either its facilities at Eau Claire, Wisconsin, or at Prairie du Chien, Wisconsin.

In its final placement order on February 4, 1987, the court noted appellant's agreement that "something had to be done to stop Tammie's running." The court found that the events on January 27 and 28 demonstrated the need for a residential placement. Again, the court provided that visitation "shall be determined by the treatment facility."

The trial court chose the Eau Claire facility based on a social worker's report that it was adequate to assist the child. The report describes the therapy, education and discipline programs of the facility, noting that discipline involved verbal intervention and "time-out," backed by a locked crisis unit and physical restraint ("using the basket hold") as a last resort "if the child is in imminent danger or assaultive to others."

---

2. The court stated in its September 29, 1986 order that the child had appeared at a September hearing and made a verbal and written request to have an attorney represent her. The court rejected the request. The court observed that counsel for the child was not necessary in a post-dispositional review, that there was no showing Tammie would be helped by a lawyer, and that Tammie's wishes were consistent with those of her mother. On October 9, the court recanted, and the child was given counsel for the first time, one year after the date (October 15, 1985) when she was first placed in foster care.

3. The child did not appear at the February 2, 1987 hearing, and the record does not explain her absence. Similarly, there is no explanation of record for absences of the child on the occasion of the original adjudication hearing (December 3, 1985), the disposition hearing (September 17, 1985), and the placement hearing (July 15, 1986).

Tammie's mother appeals the trial court's final placement decision.

## ISSUES

1. Did the trial court err in choosing a residential facility to provide care for the child?

2. Is the trial court bound by law to decide appropriate visitation contacts between a parent and a child placed in a residential facility?

3. Did the trial court abuse its discretion in refusing to hear testimony of an expert witness?

## ANALYSIS

### 1. Choice of disposition

The mother's appeal of the trial court's choice to confine the child is limited to only one facet of the confinement issue. Appellant does not dispute the decision that the child must be placed somewhere. She does not dispute the feasibility of the Eau Claire Academy program to meet the general care needs of Tammie M. Nor is this an appeal by the child.[4]

Appellant's contention before us is confined to the matter of the distance of the Eau Claire facility from St. Peter, Minnesota. The evidence shows that Eau Claire Academy facilities are located in cities 170 and 200 miles from St. Peter. "Given that distance," appellant argues, "it is difficult to comprehend how the [appellant] can spend sufficient time with the child and the child's therapist in order to correct the problems which have led to the out-of-state placement."

██ We have previously addressed the standard of review in a juvenile delinquency case, and we employ the same standard here:

> We approach the subject with recognition of the broad discretion of the trial court. As in the case of a custody decision in a dissolution case, we will affirm so long as the trial court determination is not arbitrary. *See Hansen v. Hansen,* 284 Minn. 1, 5, 169 N.W.2d 12, 14 (1969). Trial court dispositional findings of fact will be accepted unless clearly erroneous. Minn.R.Civ.P. 52.01.

*In re Welfare of L.K.W.,* 372 N.W.2d 392, 397 (Minn.Ct.App.1985).

██ The trial court's dispositional choices are set forth in Minn.Stat. § 260.-191, subd. 1 (1986). The statute permits the disposition chosen here, transfer of legal custody of the child to the county welfare board for placement purposes. *Id.* The evidence and the trial court findings must show that the disposition serves the best interests of the child, and that alternative dispositions were "not appropriate." *Id.* at subd. 1a; *see* Minn.R.Juv.Ct.P. 62.-05(b), (c). The trial court's order must include a "disposition plan." Minn.R.Juv. Ct.P. 62.05(a).

It is evident here that the trial court considered and found inappropriate numerous dispositional choices. Appellant did not unequivocally favor returning the child to her home. In a prehearing affidavit dated January 29, 1987, appellant asserted that it would be best for the child to return home. At the hearing, appellant made no

---

4. Thus, appellant's challenge of the child's confinement does not question the disciplinary plan of the institution, or the intrusiveness of any likely medical care. We must review the case without addressing the question whether the confinement is appropriately premised on a diagnosis of the child's condition; whether it merely accommodates uncorrected errors of her parents; or whether it could be avoided by meaningful in-home services. The appeal does not reach the serious conflict between statutory and constitutional law and the trial court's denial of counsel for the child until late 1986, one year after the child was first removed from her home. *See* Minn. Stat. § 260.155, subd. 2 (1986); Minn.R.Juv.Ct.P. 40.01; *In re Gault,*

387 U.S. 1, 34–42, 87 S.Ct. 1428, 1447–1451, 18 L.Ed.2d 527 (1967); we note that although the critical removal of the child from her home in July 1986 occurred in "dependency" proceedings involving appellant's child-care inabilities, the matter was in the nature of an accusatory proceeding, substituting for a delinquency complaint, based on the charge that the child had committed petty thefts. Finally, the appeal does not require a decision on the unexplained choice of the trial court to conduct proceedings outside the presence of the child, including the adjudication hearing, the initial disposition hearing, and the hearings in July 1986 and February 1987 that involved serious placement issues. *See* Minn.R.Juv.Ct.P. 42.01, 42.03, 42.04.

similar claim and said that the child's running had to be stopped. The court stated on the record that it considered placing the child at home, but abandoned that option due to episodes leading to hospitalization of the child late in January 1987. The court had tried but found no lasting value in foster care placements. The court heard evidence on an alternative care facility in Minneapolis, but the child had run at least once from that facility, and the court heard evidence that the Wisconsin facility provided a more specialized program for children with low intellectual abilities. The court also heard evidence on disadvantages of six other prospective Minnesota placements.

It is apparent that appellant's singular concern on appeal has to do with the nature and number of visitation contacts. Her objection to the Eau Claire placement is in effect an argument that great distance in and of itself is destructive of visitation contact such that the trial court has abused its discretion in picking the facility. It is true that distance of a placement is a consideration of great importance. It is not true, however, that the distance involved here makes the choice of facility arbitrary as a matter of law.

■ Appellant also contends the trial court in a child protection proceeding had no authority to place a child outside of Minnesota. Appellant's argument is supported by reference to statutory authority that is confined to cases of children who are adjudicated delinquent.[5] We appreciate, in addition, the prospective interest of Minnesota citizens in guaranteeing that Minnesota children are given care in facilities licensed and duly regulated on matters of care and discipline by public agencies of the State of Minnesota. We conclude, however, in the absence of a legislative prohibi-

tion of the placement, that we cannot say the authority of the placing agency is confined as a matter of law to placements in Minnesota.

### 2. Visitation

■ Appellant challenges the trial court's decision to delegate visitation decisions to a treatment facility staff. The controlling statute provides:

If the court orders that the child be placed outside of the child's home or present residence, it shall set reasonable rules for supervised or unsupervised parental visitation that contribute to the objectives of the court order and the maintenance of the familial relationship. No parent may be denied visitation unless the court finds at the disposition hearing that the visitation would act to prevent the achievement of the order's objectives or that it would endanger the child's physical or emotional well-being.

Minn.Stat. § 260.191, subd. 1d (1986). *See also* Minn.Stat. § 260.012 (1986) (trial court's duty "to ensure that all reasonable efforts are made to reunite a child with the child's family at the earliest possible time, consistent with the safety of the child and the public"); Minn.Stat. § 260.011, subd. 2 (1986) (purpose of laws to preserve and strengthen the child's family ties whenever possible). The facts of this case make it evident that the constructive handling of visitation, supported by other efforts to work effectively with appellant, is the primary means for pursuing the trial court's aim to reunite the family. The trial court erred in failing to set rules of visitation as mandated by statute. *Id.*

We reverse the trial court's decision on visitation (in its placement orders dated November 20, 1986 and February 4, 1987),

---

5. Pursuant to statute, the trial court transferred the child's custody to a public welfare agency for placement purposes. Minn.Stat. § 260.191, subd. 1(b)(2) (1986). Normally, this agency's out-of-state placements occur according to express authorization in one of two interstate compacts approved by the legislature. *See* Minn.Stat. § 257.40 (1986) (Interstate Compact on the Placement of Children, permitting (Article VI) institutional care in another jurisdiction for "delinquent children"); Minn.Stat. § 260.51 (1986) (Interstate Compact on Juveniles, permitting (Article X) institutional care in another state for "delinquent juveniles," defined (Article III) as juveniles previously "adjudged delinquent"). In addition, as appellant points out, the Interstate Compact on the Placement of Children excludes (Article II(d)) from institutional placements any arrangement for care in a medical facility or any institution primarily educational in character.

and remand the case for further proceedings on that subject.

### 3. Evidentiary ruling

■ At the conclusion of the hearing on February 2, 1987, the trial court refused appellant's request to reconvene for the purpose of hearing testimony by Dr. Jonathan B. Jensen, Director of Outpatient Services at the University of Minnesota Hospital and Clinic, who had contact with the child on December 9, 1986. Dr. Jensen's written "psychiatric consultation summary" was received in evidence.

The trial court refused to reconvene for the testimony of Dr. Jensen, explaining that Jensen had nothing to offer on the question of choice of placement.

Appellant contends that the trial court decided to exclude Dr. Jensen's testimony solely to avoid further public expense for fees Jensen would charge for a court appearance. We find nothing in the record to support appellant's characterization of the trial judge's decision. Rather, it is evident that the trial court believed Jensen's testimony was of little probative value and inadmissible.

Relevant evidence may be excluded by the trial court "if its probative value is substantially outweighed by * * * considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn.R.Evid. 403. Decisions on this issue are within the discretion of the trial court. *State v. Gavle,* 234 Minn. 186, 208, 48 N.W.2d 44, 56 (1951).

In his report, Dr. Jensen diagnosed the child's condition as a borderline personality disorder, involving impulsiveness and intense but unstable relationships with others. He attributed the child's difficulties to the emotional distance between the child and her biological mother. He indicated that the disorder explained the child's ambivalence about her adoptive mother, involving a clearly bonded relationship with appellant but a great deal of instability. Although Dr. Jensen called for supporting the child's bond with her mother, he recommended a structured residential placement. Jensen concluded that appellant "should be a weekly participant in the treatment program so that her role and the nature of her relationship to Tammie can be adequately understood."

We agree with appellant that Dr. Jensen's views had some probative value. His recommendation for involvement of appellant in a treatment program of the residential facility may suggest a need that will be difficult to satisfy at a Wisconsin facility. On the other hand, the trial court clearly considered the disadvantages of other placement choices. In addition, there is no evidence indicating that Dr. Jensen's recommendation cannot be carried out in the course of the present placement. Finally, appellant made no offer of proof that Jensen's testimony would differ at all from the written report which was received in evidence. We conclude the trial court did not abuse its discretion in refusing to hear this additional testimony.

### DECISION

The trial court did not abuse its discretion in choosing a placement facility located 170 to 200 miles from appellant's home. The case is remanded so that the trial court may determine the visitation contacts between the mother and child consistent with the standards of law set forth in this opinion. The court did not abuse its discretion in refusing to hear additional testimony of an expert witness.

Affirmed in part and reversed in part and remanded.